## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

RESCAP LIQUIDATING TRUST,

        Plaintiff,

v.

LENDINGTREE, LLC and
LENDINGTREE, INC.

        Defendants.

Court File No. 19-cv-2360

**COMPLAINT**

Plaintiff ResCap Liquidating Trust ("ResCap" or "Plaintiff"), by and through its attorneys, for its Complaint against LendingTree, Inc. ("LendingTree Parent") and LendingTree, LLC ("LendingTree Sub" and with LendingTree Parent, the "Defendants"), alleges as follows:

### NATURE OF ACTION

1.      This action seeks to establish the liability of Defendants LendingTree Parent and LendingTree Sub for the substantial damages caused by the selling of defective mortgage loans through LendingTree Sub's wholly-owned subsidiary, Home Loan Center, Inc. ("HLC") to ResCap's predecessor, Residential Funding Company, LLC ("RFC"). Defendants controlled HLC at all relevant times, and reaped substantial profits from its activities. Defendant LendingTree Parent expressly assumed all relevant liabilities of HLC, and thus is liable as its successor. Moreover, Defendants are liable as alter egos of HLC under California law.

2.     In December 2013, ResCap sued HLC for losses and liabilities incurred based on the defective loans that HLC sold to RFC.  A jury found HLC liable in November 2018, and this Court entered judgment against HLC for approximately $68.5 million in June 2019 ("Judgment").  The Judgment is attached as Exhibit 10.  Within a month after the Judgment, however, HLC filed for bankruptcy, claiming that it did not have resources left even to bond the appeal.

3.     This story begins in May 2003 when LendingTree Sub (then known as LendingTree, Inc.) entered into an Agreement and Plan of Merger with IAC/InterActiveCorp (then known as USA Interactive) ("IAC") and Forest Merger Corp., pursuant to which IAC acquired full ownership of LendingTree Sub.  LendingTree Sub changed its name to Tree, LLC in December 2004.

4.     In 2004, LendingTree Sub acquired HLC, a residential mortgage loan originator that was incorporated in California.  HLC operated as a wholly-owned subsidiary of LendingTree Sub, which in turn is now a wholly-owned subsidiary of LendingTree Parent.  At all relevant times, both LendingTree Sub and HLC were controlled by Douglas Lebda, who was also the founder of the "LendingTree" business and is the chairman and chief executive officer of LendingTree Parent.

5.     Following the acquisition, LendingTree Sub controlled every aspect of HLC's business.  It caused HLC to source mortgage loans from LendingTree's family of websites under the "LendingTree Loans" name.  Moreover, it caused HLC to continue to sell loans to purchasers in the secondary market, including to RFC.  In addition, Defendants also guaranteed the funding critical to the LendingTree Loans business.

6.      In August 2008, LendingTree Sub spun off from IAC (the "Spin-Off").  As part of the Spin Off, Defendant LendingTree Parent (then Tree.com, Inc.) was incorporated and became the parent of LendingTree Sub.  LendingTree Parent expressly agreed to assume HLC's liabilities, including those related to "LendingTree Loans."

7.      By 2011, HLC faced a growing number of repurchase demands from purchasers based on misrepresentations it had made concerning the credit quality of mortgage loans it had sold in the secondary market.  In response to this growing liability, Defendants caused HLC to sell all of its operating assets, rendering it a mere shell that would conduct no further business, and whose principal activity would be distributing cash to Defendants and defending the claims for which Defendants were co-liable.

8.      In late 2013, RFC filed a complaint against HLC in Minnesota state court, attached as Exhibit 9, bringing claims for breach of contract and contractual indemnification in connection with the defective loans sold to RFC in the secondary market.  The action was removed to this Court in 2014, and ResCap was substituted for RFC as the plaintiff.  The action proceeded to trial, resulting in the Judgment.

9.      Defendants caused HLC to litigate against ResCap for five-and-a-half years. During that time, the majority of HLC's cash was distributed to Defendants.  Most of the remaining cash was spent on professional fees defending ResCap's action, and while the HLC litigation was ongoing before this Court, Defendants paid numerous lawyers and other professionals in connection with the contemplated bankruptcy of HLC.  At no time during the litigation did HLC or either Defendant inform ResCap or the Court that HLC did not have adequate funds to pay any judgment.  Instead, just one month after entry of a

judgment against HLC for approximately $68.5 million, HLC filed for bankruptcy, for the first time disclosing that it had no more than approximately $5.4 million in cash remaining.

10.     Defendants, however, cannot escape the fact that LendingTree Parent expressly assumed all of HLC's relevant liabilities, including for the Judgment.  Nor can they escape the fact that they controlled and profited handsomely from HLC, before HLC became an empty shell, unable to pay the Judgment that was awarded after nearly five-and-a-half years of litigation and a three-week trial.  ResCap now brings this action to recover the $68.5 million Judgment from Defendants.

## PARTIES

11.     ResCap is an express trust and a Delaware Statutory Trust.  When its chapter 11 case was commenced, RFC was a Delaware limited liability company with its principal place of business in Minneapolis, Minnesota.[1]  Pursuant to RFC's chapter 11 plan which was confirmed by the United States Bankruptcy Court for the Southern District of New York in 2013, ResCap has now succeeded to all of RFC's rights and interests.

12.     Defendant LendingTree Sub is a Delaware limited liability company with its principal place of business at 11115 Rushmore Drive, Charlotte, North Carolina 28277. LendingTree Sub was originally incorporated as LendingTree, Inc. in June 1996.  In May 2003, LendingTree Sub entered into an Agreement and Plan of Merger with IAC and Forest Merger Corp., pursuant to which IAC acquired all of LendingTree Sub's stock.

---

[1]   RFC was formerly known as Residential Funding Corporation.

LendingTree Sub converted to Tree, LLC in December 2004, and is now called LendingTree, LLC.

13.     In August 2008, LendingTree Sub spun off from IAC.  As part of that transaction, Defendant LendingTree Parent was incorporated as a publicly-traded company named Tree.com, Inc. and became the parent of LendingTree Sub.  Tree.com, Inc. subsequently changed its name to Tree, Inc., and is now called LendingTree, Inc.

14.     Defendant LendingTree Parent is a publicly-traded corporation incorporated in Delaware with its principal place of business at 11115 Rushmore Drive, Charlotte, North Carolina 28277.

15.     LendingTree Parent is the sole member of LendingTree Sub.  LendingTree Sub is the sole shareholder of HLC and owns 100% of HLC's stock.  Lebda is the chief executive officer, chairman of the board, and a shareholder of LendingTree Parent, the sole manager of LendingTree Sub, and until February 2019, was the sole director of HLC.  In February 2019, Lebda appointed Kyle Everett of Development Specialists, Inc. as HLC's sole director.

16.     Non-party HLC is a California corporation with its principal place of business at 11115 Rushmore Drive, Charlotte, North Carolina 28277.  HLC is a second-generation Internet-based direct mortgage lender that was incorporated in California in September 2000 under the name FreeApprovalFinder.com, Inc.  It changed its name to Home Loan Center, Inc. on March 8, 2002.  HLC sold substantially all of its operating assets to Discover Bank in 2012.  However, Tree.com, Inc. (now LendingTree Parent) kept all pre-closing liabilities and repurchase, warranty, and indemnification liabilities

associated with any HLC mortgage loans.  Since 2012, HLC has conducted no new business, and its principal and essentially only activity has been the litigation of claims arising from its origination of residential mortgage loans.

17.     RFC sued HLC in December 2013 in Minnesota State Court for breach of contract and indemnification in connection with HLC's sale of defective mortgage loans to RFC in the secondary market.  The action was removed to this Court in 2014, and ResCap was substituted as the plaintiff.  ResCap obtained a jury verdict against HLC in November 2018, and the approximately $68.5 million Judgment against HLC on June 21, 2019.  On July 21, 2019, HLC filed a chapter 11 bankruptcy petition in the United States Bankruptcy Court for the Northern District of California.[2]

18.     Non-party Douglas Lebda is an individual who, on information and belief, is and has been a resident of North Carolina at all times relevant to this Complaint.

## JURISDICTION AND VENUE

19.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000 and is between citizens of different

---

[2]   For the avoidance of doubt, this Complaint does not name HLC as a party, nor does it assert any claim against or seek any relief from HLC or its bankruptcy estate.  Nor does this Complaint assert any claims of or on behalf of HLC or its bankruptcy estate, or any trustee or debtor in possession in HLC's bankruptcy case.  *See, e.g.*, *Ahcom, Ltd. v. Smeding*, 623 F.3d 1248, 1252 (9th Cir. 2010) (individual creditors, rather than a trustee, have standing to assert an alter ego claim or cause of action under California law); *In re Ozark Rest. Equip. Co., Inc.*, 816 F.2d 1222, 1225-26 (8th Cir. 1987) (same, applying Arkansas law); *In re Panther Mountain Land Dev., LLC*, 686 F.3d 916, 923 (8th Cir. 2012) (automatic stay does not extend to non-debtor parties, "even if they are in a similar legal or factual nexus with the debtor" (internal quotations omitted)).

States.  This Court also has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, in that the matter is related to RFC's bankruptcy proceedings.

20.     Venue is proper in this Court because (i) the cause of action arose, in part, in Minnesota; (ii) Defendant LendingTree Parent expressly assumed all repurchase, warranty, and indemnification liabilities associated with any HLC mortgage loans; (iii) RFC and Defendants' alter-ego, HLC, contractually agreed in the Client Contract that this Court is the appropriate venue for any disputes arising under the Client Contract; and (iv) Defendants are liable for the Judgment entered by this Court.

## FACTUAL BACKGROUND

### A.  LendingTree's Acquisition of HLC and Subsequent Control Of Its Operations

21.     HLC, then FreeApprovalFinder.com, was incorporated in California in 2000 and was headquartered in Irvine, California.  It changed its name to Home Loan Center, Inc. on March 8, 2002.  HLC made mortgage loans directly to consumers as the industry's first full spectrum online retail mortgage lender.  It was a top ten online direct lender, approved in all 50 states.

22.     In September 2004, LendingTree Sub (then LendingTree, Inc.) entered into an agreement to acquire all of HLC's outstanding stock.  The transaction was completed in December 2004.  After LendingTree Sub acquired HLC, LendingTree Sub operated its lending business through HLC.  The business consisted of originating mortgage loans and selling those loans to secondary market purchasers, including RFC.

23.     On information and belief, LendingTree Sub controlled every aspect of HLC's business and exploited HLC for its own gain.  LendingTree Sub's domination and exploitation of HLC is demonstrated by, among other salient facts, the following:

a.  LendingTree Sub operated HLC under the brand name "LendingTree Loans," and HLC did business as "LendingTree Loans."

b.  HLC's revenues were primarily derived from the origination and sale of loans branded as "LendingTree Loans."  "LendingTree Loans"-branded loan originations were primarily sourced from consumer loan requests received by the LendingTree family of websites and phone platforms.

c.  Most of HLC's customer leads were generated by the LendingTree network and originated under the name "LendingTree Loans."

d.  Only a small portion of HLC's customer leads were sourced from non-LendingTree channels, such as third party lead aggregators, direct mail marketing campaigns, and HLC's own website.  HLC only used its own brand name—HomeLoanCenter—when offering loans through third party resources.

e.  LendingTree Sub funded HLC's business through warehouse lines of credit entered into and/or guaranteed by LendingTree Sub.

f.  LendingTree Sub would not permit HLC to retain sufficient capital or obtain sufficient credit to hold onto loans for longer than 30 days.

**B.**     **Defendants Expressly Assumed All of HLC's Liabilities**

24.     In May 2003, LendingTree Sub (then LendingTree, Inc.) entered into an Agreement and Plan of Merger with IAC, pursuant to which IAC acquired all of LendingTree Sub's stock.

25.     In August 2008, LendingTree Sub spun off from IAC.  As part of the Spin Off, LendingTree Parent (then Tree.com, Inc.) was incorporated and became the parent of LendingTree Sub.   In addition, as part of Spin Off, Defendant LendingTree Parent expressly agreed to assume all of HLC's liabilities, including those related to "LendingTree Loans."

26.     In a 2008 S-1 filing following the Spin Off, LendingTree Parent (then Tree.com, Inc.) disclosed (at page F-32) that "Tree.com will assume all of the liabilities related to the Tree.com Businesses," and defined "Tree.com Businesses" as "LendingTree Loans," which was the dba for HLC (at 58-59).  A copy of the 2008 S-1 is attached as Exhibit 1.

27.     In the same 2008 S-1 filing (at page 58), LendingTree Parent stated that its financial statements and disclosures "reflect the contribution or other transfer to Tree.com of all the subsidiaries and assets ***and the assumption by Tree.com of all the liabilities relating to the Tree.com Businesses*** in connection with the spin-off" (emphasis added).

28.     The Separation and Distribution Agreement implementing the Spin Off confirms that LendingTree Parent assumed all of HLC's liabilities relating to LendingTree Loans.  That agreement is attached as Exhibit 2.

29.     That agreement provides, in section 2.03(b), that: "Each Spinco agrees to accept, assume and faithfully perform, discharge and fulfill all of its Corresponding Liabilities …." "Spinco" was defined (at 1) to include "Tree Spinco," which is LendingTree Parent (then Tree.com, Inc.). "Corresponding Liabilities" was defined (at 6) as "with respect to Tree Spinco, any Tree Entity or the Tree Group, … the Tree Liabilities."

30.     Section 2.10(g) defined "Tree Liabilities" as including "any Liability of a Spun Entity, whether arising or accruing prior to, on or after the Effective Time … shall be a Corresponding Liability of such Spun Entity's Corresponding Group." Section 2.10(h) defined "Tree Liabilities" to include "any Liability relating to, arising out of, or resulting from the conduct of, a Spun Business … whether arising or accruing prior to, on or after the Effective Time and whether the facts on which it is based occurred on, prior to or after the Effective Time … shall be a Corresponding Liability of such Spun Business' Corresponding Group."

31.     "Corresponding Group" means "with respect to the Lending and Real Estate Business … the Tree Group." Exhibit 2 at 5. "Tree Group" means Tree Spinco, the Tree Entities, and each other person "that is a direct or indirect Subsidiary of Tree Spinco …." *Id.* at 19.

32.     Public filings following the Spin Off confirm that LendingTree Parent assumed HLC's liabilities, including relating to the LendingTree Loans and, specifically, repurchase and indemnification obligations.

33.     For example, in its 2008 10-K filing on February 27, 2009 (at page 50), LendingTree Parent stated that "[t]he historical consolidated financial statements of

Tree.com and its subsidiaries reflect the contribution or other transfer of Tree.com of all the subsidiaries and assets and ***the assumption by Tree.com of all the liabilities relating to the Tree.com Businesses*** in connection with the spin-off and the allocation to Tree.com of certain IAC corporate expenses relating to the Tree.com Businesses" (emphasis added). A copy of the 2008 annual 10-K filing is attached as Exhibit 3.  Similar disclosures were included in other LendingTree Parent filings with the Securities and Exchange Commission ("SEC") through at least 2011.

34.     Moreover, in its 2011 annual 10-K filed April 16, 2012 (at page 81), LendingTree Parent stated: "Tree.com will ***continue to be liable*** for indemnification obligations, repurchase obligations and premium repayment obligations following the anticipated sale of substantially all of the operating assets of the LendingTree Loans business to Discover. … We plan to negotiate with secondary market purchasers to settle any then-existing and future contingent liabilities" (emphasis added).  *See also id.* at 11 ("We [defined as LendingTree Parent] will continue to be liable for these indemnification obligations, repurchase obligations and premium repayment obligations following the anticipated sale of substantially all of the operating assets of our LendingTree Loans business to Discover.").  A copy of 2011 10-K filing is attached as Exhibit 4.

C. <u>Defendants Forced HLC To Sell All Of Its Operating Assets But Retained Certain Liabilities</u>

35.     In connection with the sales of residential mortgage loans to secondary market purchasers, HLC would routinely make representations to those purchasers regarding, among other things, borrower credit information, loan documentation, and

collateral. The secondary market purchasers included RFC. Over the course of the parties'
relationship, HLC sold over 6,200 mortgage loans, with an original principal balance in
excess of $600 million, to RFC.

36.     HLC made a number of misrepresentations regarding the credit quality of the
mortgage loans in the contract governing the sale of such mortgage loans. HLC's
representations to purchasers were consistently false, and subjected HLC to a significant
number of repurchase demands. Indeed, by early 2011, HLC was subject to a growing
number of repurchase demands based on defective mortgage loans it had sold to secondary
market purchasers. As set forth in their own SEC filings, Defendants realized that they
could be subject to significant liabilities in connection with the origination and sale of
defective mortgage loans by HLC.

37.     In May 2011, LendingTree Parent, LendingTree Sub, and HLC entered into
an asset purchase agreement ("APA") with Discover Financial Services. Pursuant to the
APA, HLC sold all of its operating assets to Discover for $55.9 million (the "Sale
Proceeds"). The sale closed in June 2012 (the "2012 Sale"). $17.1 million of the $55.9
million Sale Proceeds were held in escrow "pending the resolution of certain actual and/or
contingent liabilities that remain[ed] [LendingTree Parent's] responsibility following such
sale." A copy of the APA is attached as Exhibit 8.

38.     In the APA, Discover expressly disclaimed the assumption of pre-closing
liabilities and repurchase, warranty, and indemnification liabilities associated with any
HLC mortgage loans. The APA provided that these "Excluded Liabilities" would "remain
the sole responsibility of … Parent and its Affiliates (as applicable)," and defined the

Excluded Liabilities as "every Liability of Parent and its Affiliates (including the Subsidiaries)," including the repurchase, warranty, and indemnification obligations associated with HLC's mortgage loans.  The APA defined the "Parent" as LendingTree Parent (then called Tree.com, Inc.).

39.     Since 2012, HLC has operated as a shell company and has not conducted any business.  It has no inventory, real property, equipment, or employees.  On information and belief, HLC substantially completed its "wind down" by the beginning of 2015, and since that time, its activities have been limited to disputing claims brought by plaintiffs concerning its defective mortgages, and occasionally releasing legacy recorded interests on properties for which it had assigned away any interest in the applicable mortgage years ago.  On information and belief, following the 2012 Sale, HLC's assets primarily consisted of the Sale Proceeds.  HLC's sole director, Lebda, was the CEO and Chairman of LendingTree Parent, which was the sole member of LendingTree Sub.

40.     In December 2013, RFC filed a lawsuit against HLC in Minnesota state court asserting claims for breach of contract and contractual indemnification based on allegations that HLC had breached numerous representations and warranties relating to the underwriting and origination of the mortgage loans sold to RFC in the secondary market. *Residential Funding Company, LLC v. Home Loan Center, In*c., Case No. 27-CV-14-3609, District Court for the Fourth Judicial District of Minnesota (the "ResCap Litigation").  The ResCap Litigation subsequently was removed to this Court. *Residential Funding Co., LLC v. Home Loan Center, Inc.*, No. 14-cv-1716 (DWF/JJK).  The engagement letter between HLC and its counsel in connection with the ResCap Litigation was addressed to

LendingTree Sub, and LendingTree Sub agreed to guarantee payments of all of HLC's legal fees incurred in the ResCap Litigation.  Upon information and belief, Lebda was involved in the decision-making for HLC in the ResCap Litigation, until the appointment of Kyle Everett.

### D. RFC's Bankruptcy

41.     RFC was, at times prior to its bankruptcy in May 2012, in the business of acquiring and securitizing residential mortgage loans.  Its business model was built on acquiring loans from "correspondent lenders," such as HLC, and distributing those loans by either pooling them together with other similar mortgage loans to sell into residential mortgage-backed securitization ("RMBS") trusts or selling them to whole loan purchasers. As explained above, over the course of the parties' relationship, HLC sold over 6,200 mortgage loans to RFC, with an original principal balance in excess of $600 million.

42.     Critical to RFC's business success was the quality of the loans it purchased. To that end, RFC required its correspondent lenders, including HLC, to abide by stringent loan-level contractual representations and warranties designed to protect RFC from the risks of borrower fraud, appraisal fraud, failure to comply with state and federal law, and other credit and compliance factors that could negatively impact the performance and value of the loans it purchased.  Ultimately, due in significant part to the failure of correspondent lenders, including HLC, to honor their contractual representations and warranties, RFC was sued by numerous counterparties and investors in its RMBS, based on allegations that the loans contained numerous defects and were rife with fraud and compliance problems.

43.     In May 2012, RFC was forced to file a chapter 11 bankruptcy case, which is part of the jointly administered chapter 11 cases pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under the caption *In re Residential Capital, LLC, et al.*, Case No. 12-12020 (MG).

44.     By the time RFC and certain of its affiliates (collectively, the "Debtors") filed their bankruptcy cases, RFC was facing over two dozen lawsuits around the country, all alleging that the loans RFC had securitized were defective, as well as claims by investors in hundreds of its RMBS seeking tens of billions of dollars in damages based on loan-level problems.  During the bankruptcy cases, hundreds of proofs of claim were filed by dozens of claimants, including investors, class action plaintiffs, monoline insurers, RMBS holders, and indenture trustees acting at their direction claiming breaches of representations and warranties, whole loan investors, and non-debtor co-defendants (such as underwriters of the RMBS offerings).  Collectively, these claims alleged tens of billions of dollars of damages stemming from defective loans, including those sold to RFC by HLC.

45.     Following a lengthy and intensive mediation presided over by the Bankruptcy Court and related proceedings, RFC was able to resolve its RMBS-related liabilities for over $10 billion of allowed claims.  On December 11, 2013, after a five-day confirmation trial, the Bankruptcy Court approved, among other things, the resolution of RFC's RMBS related liabilities, and confirmed the Second Amended Joint Chapter 11 Plan Proposed by Residential Capital LLC, et al. and the Official Committee of Unsecured Creditors, Case No. 12-12020 (MG) (Bankr. S.D.N.Y.) [D.I. 6065-1] (the "Plan").  Pursuant to the Plan and the Bankruptcy Court's order confirming the Plan, ResCap is

responsible for monetizing many of the Debtors' remaining assets and pursuing litigation claims, including RFC's claims against HLC, and distributing the proceeds to the Debtors' creditors.

### E. After Years of Litigation, ResCap Obtained A $68.5 Million Judgment Against HLC

46.     The ResCap Litigation lasted for over five-and-a-half years.  During this time, ResCap responded to over 1,000 written discovery requests, produced over 3 million documents (consisting of nearly 24 million pages), defended over 150 fact depositions noticed in the HLC case, and reviewed hundreds of thousands of third-party documents. Also during this time, ResCap and HLC engaged in three unsuccessful, court-supervised mediations, in August 2016, March 2018, and September 2018.

47.     In April 2018, ResCap, HLC, and several other Defendants filed dueling summary judgment motions and motions to exclude certain proposed testimony of 20 expert reports ("*Daubert* Motions").  The summary judgment briefing totaled nearly 600 pages.  In addition to the "consolidated" summary judgment briefing, HLC filed its own defendant-specific briefing, to which ResCap responded.  On June 19 and 20, 2018, the Honorable Judge Nelson heard approximately 15 hours of argument on the summary judgment motions and *Daubert* Motions.  On August 15, 2018, the Honorable Judge Nelson issued a 182 page opinion on the parties' summary judgment motions, resolving certain issues in favor of ResCap, others in favor of the defendants, and reserving a number of complex issues for jury determination.

48.     In September 2018, ResCap and HLC engaged in a settlement conference that again proved unsuccessful.  ResCap then turned its attention to trial against HLC, which was scheduled to commence on October 15, 2018.

49.     Both ResCap and HLC prepared detailed and vigorous cases.  ResCap's initial witness and exhibit lists listed 4,537 exhibits and 29 live witnesses, while HLC's initial witness and exhibit list listed several thousand exhibits and 26 live witnesses. Additionally, in the weeks leading up to the trial, the Honorable Judge Nelson held four HLC-specific in-person pre-trial conference to address disputes raised by HLC concerning the summary judgment order and certain defenses.  In its final exhibit and witness list, HLC identified over 150 exhibits and 19 live witnesses.

50.     Trial lasted over three weeks—from October 15 to November 7, 2018. ResCap presented its case from October 16 to October 30, offering 15 fact witnesses, five expert witnesses, and approximately 55 exhibits.   HLC cross-examined several of ResCap's witnesses at length.  HLC put on its case for the remainder of the time, offering six fact witnesses, two expert witnesses, and approximately 40 exhibits.  At the conclusion of the trial, the Court granted ResCap judgment as a matter of law on several issues, including the reasonableness of the bankruptcy settlements and on HLC's affirmative defense of equitable estoppel.  The Court left several other issues for jury determination. After just two-and-a-half hours of deliberation, the jury returned a verdict of $28.7 million for ResCap.

51.     Following trial, the Court also granted ResCap's motions for prejudgment interest and attorney fees.  On June 21, 2019, the Court entered a judgment against HLC

for $68,484,502.06 against HLC and in favor of ResCap (the "Judgment"). On July 19, 2019, HLC filed a notice of appeal. On July 21, 2019, HLC filed a chapter 11 petition in the Northern District of California. *In re Home Loan Center, Inc.*, 5:19-bk-51455 (MEH). HLC disclosed that it had approximately $11 million in assets. Of that $11 million, about $5.4 million was cash. The rest consisted of retainers paid to various restructuring professionals, an ownership interest in HLC Escrow, Inc., and certain tax attributes.

52.     At no time during the pendency of the litigation did Defendants or HLC ever inform ResCap or this Court that HLC was insolvent or would be unable to pay any judgment entered.

**F. Defendants Continue to Recognize That They Expressly Assumed HLC's Repurchase Liabilities**

53.     Before the ResCap Litigation, while the ResCap Litigation was pending, and even *after* HLC filed bankruptcy, Defendants represented that they were responsible for HLC's liabilities.

54.     Notably, from 2011 to 2018, LendingTree Parent's annual filings with the SEC explicitly acknowledged its responsibility for HLC's liabilities.

55.     For example, in its 2011 10-K (at 81), LendingTree Parent (then Tree.com, Inc.) stated: "Tree.com will continue to be liable for indemnification obligations, repurchase obligations and premium repayment obligations following the anticipated sale of substantially all of the operating assets of the LendingTree Loans business to Discover. … We plan to negotiate with secondary market purchasers to settle any then-existing and future contingent liabilities …."

56.     Further, in its 2013 10-K (at 8), LendingTree Parent disclosed that: "[w]e continue to be liable for [HLC's] indemnification obligations, repurchase obligations and premium repayment obligations following the sale of substantially all of the operating assets of our LendingTree Loans business [HLC]."  In the same filing, LendingTree Parent disclosed (at 29) estimates of "*our* exposure related to *our* obligation to repurchase loans previously sold to investors" and referenced its difficulties in estimating "*our* maximum exposure for breaches of the representations and warranties *LendingTree Loans* made to the investors" (emphasis added).  A copy of the 2013 10-K is attached as Exhibit 5.

57.     Likewise, in its 2018 10-K, LendingTree Parent specifically discussed the ResCap Litigation.  It disclosed that ResCap had obtained a jury verdict of $28.7 million and that it was seeking both prejudgment interest and attorney fees.  LendingTree Parent stated (at 13): "*We* have incurred substantial legal fees in this matter," and "[t]he ultimate outcome of the [ResCap Litigation] and the outcomes of other pending of indemnification claims, repurchase obligations or premium repayments beyond *our* reserves for these contingencies, including legal fees *we* incur, may have a material and adverse effect on *our* business, financial condition and results of operations" (emphasis added).  A copy of the 2018 10-K is attached as Exhibit 6.

58.     And Defendants believed they could be liable for ResCap's claims even after HLC bankruptcy.  In its 10-Q for the second quarter of 2019, which was filed on July 25, 2019, four days after HLC's bankruptcy—LendingTree Parent (at 30) estimated a liability of $7 million in the ResCap Litigation as of June 30, 2019.  LendingTree Parent also attributed (at 41) losses to its "LendingTree Loans business formerly operated by our

[HLC] subsidiary."  And, LendingTree Parent disclosed (at 45) that HLC's creditors could assert claims against "directly against *our* company [which] could result in losses to *us*" (emphasis added).  A copy of the 2019 10-Q is attached as Exhibit 7.

## COUNT ONE
## (DECLARATORY RELIEF AGAINST LENDINGTREE PARENT)

59.     Plaintiffs reallege each and every allegation set forth in Paragraphs 1 through 58 above as if fully set forth herein.

60.     An actual controversy has arisen and now exists between ResCap and LendingTree Parent.  ResCap contends, but is informed and believes that LendingTree Parent denies, that LendingTree Parent is liable to ResCap for the amounts due under the Judgment because it has expressly assumed HLC's repurchase and indemnification liabilities, including, specifically, the liabilities reflected in the Judgment.

61.     When Lending Tree Sub was spun off from IAC, LendingTree Parent (then Tree.com, Inc.) expressly agreed to assume all of HLC's liabilities related to "LendingTree Loans," which was HLC's dba.  In the Separation and Distribution Agreement that implemented the Spinoff, LendingTree Parent agreed to "accept, assume and faithfully perform, discharge and fulfill all of its Corresponding Liabilities," which were defined to include, among other things, any liability "of a Spun Entity" or any liability "relating to, arising out of, or resulting from the conduct of a Spun Business …," which "shall be a Corresponding Liability of such Spun Business' Corresponding Group."   The "Corresponding Group," with respect to lending and real estate business was LendingTree Parent, along with any entity "that is a direct or indirect Subsidiary" of LendingTree Parent.

62.     Indeed, before the ResCap Litigation, while the ResCap Litigation was pending, and even after HLC filed bankruptcy, LendingTree Parent admitted that it was liable for ResCap's claims. From 2008 to 2018, LendingTree Parent's filings with the SEC explicitly acknowledged responsibility for HLC's repurchase and indemnification liabilities. Among other things:

a.     In a 2008 S-1 (Exhibit 1) filing following the Spin Off, LendingTree Parent (then Tree.com, Inc.), disclosed that "Tree.com will assume all of the liabilities related to the Tree.com Businesses," and defined "Tree.com Businesses" as "LendingTree Loans," which is the dba for HLC.

b.     In a 2008 10-K filing (Exhibit 3), LendingTree Parent (then Tree.com, Inc.) disclosed that: "The historical consolidated financial statements of Tree.com and its subsidiaries reflect the contribution or other transfer of Tree.com of all the subsidiaries and assets and ***the assumption by Tree.com of all the liabilities relating to the Tree.com Businesses*** in connection with the spin-off and the allocation to Tree.com of certain IAC corporate expenses relating to the Tree.com Businesses" (emphasis added).

c.     In its 2011 10-K (Exhibit 4), LendingTree Parent (then Tree.com, Inc.): stated: "***Tree.com will continue to be liable for indemnification obligations, repurchase obligations and premium repayment obligations following the anticipated sale of substantially all of the operating assets of the LendingTree Loans business to Discover.*** … We

plan to negotiate with secondary market purchasers to settle any then-existing and future contingent liabilities …." (emphasis added).

    d.    In its 2013 10-K (Exhibit 5), LendingTree Parent (then Tree.com, Inc.) disclosed that "*[w]e continue to be liable* for these indemnification obligations, repurchase obligations and premium repayment obligations following the sale of substantially all of the operating assets of our LendingTree Loans business [HLC]" and referenced difficulties in estimating "*our* maximum exposure for breaches of the representations and warranties *LendingTree Loans* made to the investors" (emphasis added).

    e.    In its 2018 10-K (Exhibit 6), LendingTree Parent discussed the ResCap Litigation, stating that "*We* have incurred substantial legal fees in this matter," and "[t]he ultimate outcome of the [ResCap Litigation] and the outcomes of other pending of indemnification claims, repurchase obligations or premium repayments beyond *our* reserves for these contingencies, including legal fees *we* incur, may have a material and adverse effect on *our* business, financial condition and results of operations" (emphasis added).

63.    Additionally, during the 2012 sale of HLC's assets to Discover, LendingTree Parent acknowledged that it was liable for repurchase, warranty, and indemnification obligations. The asset purchase agreement (Exhibit 8) with Discover excluded liabilities relating to repurchase, warranty, and indemnification obligations, as those liabilities were

the responsibility of the "Parent and its Affiliates (including the Subsidiaries)." The Parent and its Affiliates was defined as Tree.com, Inc. (which is now LendingTree Parent). Upon information and belief, this language was included in that agreement to reflect LendingTree Parent's recognition that it was liable for HLC's repurchase, warranty, and indemnification obligations.

64.     In addition, Defendants guaranteed repurchase agreements and warehouse credit facilities between HLC and Citibank, and between HLC and Credit Suisse, which provided financing for HLC until the completion of the sale to Discover. Upon information and belief, Defendants guaranteed HLC's agreements because they knew they were responsible for HLC's repurchase obligations. Upon information and belief, Discover knew Defendants had guaranteed HLC's repurchase agreements and warehouse credit facilities, and that any reasonable purchaser would expect the reason for those guarantees was that Defendants were responsible for HLC's losses.

65.     ResCap seeks a judicial determination of the respective rights and duties of ResCap and LendingTree Parent with respect to the foregoing. In particular, ResCap seeks a declaration that LendingTree Parent expressly assumed the repurchase liabilities of HLC and as such, LendingTree Parent is liable to ResCap for the amounts due under the Judgment. Such a declaration is necessary and appropriate at this time in order to ensure that ResCap may ascertain its rights with respect to the Judgment.

**COUNT TWO**
**(DECLARATORY RELIEF AGAINST LENDINGTREE SUB AND**
**LENDINGTREE PARENT)**

66.     Plaintiffs reallege each and every allegation set forth in Paragraphs 1 through 65 above as if fully set forth herein.

67.     An actual controversy has arisen and now exists between ResCap and Defendants.  ResCap contends, but is informed and believes that Defendants deny, that each of the Defendants is liable to ResCap for the amounts due under the Judgment because they are HLC's alter egos.

68.     There was such unity of interest between Defendants and HLC that their separate personalities did not in reality exist.  The unity of interest is demonstrated by, among numerous other salient facts, the following:

      a.     LendingTree Parent wholly owns LendingTree Sub, which wholly owns HLC.  Lebda, who is the founder, chairman of the board, chief executive officer, and stockholder of LendingTree Parent, is the sole manager of LendingTree Sub and until February 2019, was the sole director of HLC.

      b.     Defendants and HLC all operated at the same address—11115 Rushmore Drive, Charlotte, North Carolina 28277.

      c.     Defendants branded HLC as "LendingTree Loans" and integrated it into LendingTree's online exchange platform.   That is because, on information and belief, HLC's lending platform was an integral part of Defendants' business strategy of creating competition and making loans on LendingTree's exchange platform.  Nearly all of HLC's loans were

originated using leads generated from the LendingTree website of families.

d.   Defendants represented in numerous filings with the SEC that they were liable for HLC's repurchase and indemnification obligations, including, specifically, the obligations to ResCap.

e.   Defendants guaranteed debts vital to HLC's mortgage business—the credit warehousing facilities that allowed HLC to remain in operation.

f.   Defendants manipulated HLC's assets and liabilities, ensuring that HLC was undercapitalized at all times so that they would not own up for their wrongdoing.  Defendants ensured that HLC lacked sufficient capital to hold onto loans for more than 30 days.

69.     It would be inequitable if the acts of HLC are treated as those of HLC alone. That is because if the acts of HLC are treated as those of HLC alone, Defendants will have been allowed to abuse the corporate form to funnel funds out of HLC to try and insulate themselves from liability.

70.     ResCap seeks a judicial determination of the respective rights and duties of ResCap and the Defendants with respect to the foregoing.  In particular, ResCap seeks a declaration that each of the Defendants is liable to ResCap for the amounts due under the Judgment.  Such a declaration is necessary and appropriate at this time in order to ensure that ResCap may ascertain its rights with respect to the Judgment.

## COUNT THREE
## (DECLARATORY RELIEF AGAINST LENDINGTREE SUB AND LENDINGTREE PARENT)

71.     Plaintiffs reallege each and every allegation set forth in Paragraphs 1 through 70 above as if fully set forth herein.

72.     An actual controversy has arisen and now exists between ResCap and Defendants.  ResCap contends, but is informed and believes that Defendants deny, that each of the Defendants is liable to ResCap for the amounts due under the Judgment because (i) Defendants were each principals who dominated and controlled their agent, HLC; (ii) HLC was acting within the scope of its agency when it sold defective mortgage loans to RFC; and (iii) Defendants represented to the world that they were liable for repurchase and indemnification obligations based on contracts entered into by their agent, HLC.

73.     After LendingTree Sub (then LendingTree, Inc.) acquired HLC, it operated its own lending business, which consisted of originating loans and selling those loans to secondary market purchasers, including RFC, through HLC.

74.     On information and belief, Defendants controlled very aspect of HLC's business, exploited HLC for its own gain, and caused HLC to originate loans and sell them to purchasers in the secondary market, including RFC.

75.     Defendants' domination and exploitation of HLC is demonstrated by, among other things, the following:

        a.     Defendants caused HLC to operate under the brand name "LendingTree Loans."

b.   HLC's revenues were primarily derived from the origination and sale of loans branded as "LendingTree Loans."

c.   "LendingTree Loans" were primarily sourced from consumer loan requests received by LendingTree websites and phone platforms.

d.   Most of HLC's customer leads were generated by the LendingTree network.

e.   LendingTree Sub, at the direction of LendingTree Parent, funded HLC's business through warehouse lines of credit entered into and/or guaranteed by LendingTree Sub.

f.   Defendants would not permit HLC to retain sufficient capital or obtain sufficient credit to hold onto loans for longer than 30 days.

76.     Defendants made it known to the world that HLC was their agent and was acting within the scope its agency when it originated and sold loans to purchasers in the secondary market, including RFC.  For example, in its 2011 10-K, LendingTree Parent (then Tree.com, Inc.):  stated: "***Tree.com will continue to be liable for indemnification obligations, repurchase obligations and premium repayment obligations following the anticipated sale of substantially all of the operating assets of the LendingTree Loans business to Discover.*** … We plan to negotiate with secondary market purchasers to settle any then-existing and future contingent liabilities …."  Similarly, in its 2013 10-K, LendingTree Parent (then Tree.com, Inc.) disclosed that "***[w]e continue to be liable*** for these indemnification obligations, repurchase obligations and premium repayment obligations following the sale of substantially all of the operating assets of our LendingTree

Loans business [HLC]"  and referenced difficulties in estimating "*our* maximum exposure for breaches of the representations and warranties *LendingTree Loans* made to the investors[.]"

77.        ResCap seeks a judicial determination of the respective rights and duties of ResCap and the Defendants with respect to the foregoing.  In particular, ResCap seeks a declaration that each of the Defendants is liable, as HLC's principal, to ResCap for the amounts due under the Judgment.  Such a declaration is necessary and appropriate at this time in order to ensure that ResCap may ascertain its rights with respect to the Judgment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment in its favor and against the Defendants as follows:

(A)      A declaratory judgment that Defendants assumed HLC's repurchase and indemnification liabilities, including the liabilities to ResCap reflected in the Judgment;

(B)      A declaratory judgment that Defendants are responsible to pay the Judgment as HLC's alter-egos;

(C)      A declaratory judgment that Defendants are liable for HLC's repurchase and indemnification liabilities, specifically the liabilities to ResCap reflected in the Judgment, as the principals of their agent, HLC, which was acting within the scope of its agency when it sold defective mortgage loans to RFC, and because Defendants caused the world to believe they were liable for such repurchase and indemnification liabilities.

(D)      An award of attorneys' fees, interest, and costs to the fullest extent permitted by law; and

(E)     All such further relief as the Court deems necessary or proper.

Dated:  August 27, 2019

SPENCER FANE LLP

By:   */s/ Jessica J. Nelson*
    Donald G. Heeman, #286023
    Jessica J. Nelson, #347358
    Randi J. Winter, #0391354
    150 South Fifth Street, Suite 1900
    Minneapolis, MN  55402
    Telephone:  (612) 268-7000
    Facsimile:  (612) 268-7001
    dheeman@spencerfane.com
    jnelson@spencerfane.com
    rwinter@spencerfane.com

QUINN EMANUEL URQUHART
& SULLIVAN, LLP

Peter E. Calamari (*pro hac vice*)
Manisha M. Sheth (*pro hac vice*)
Isaac Nesser (*pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone:  (212) 849-7000
Facsimile:  (212) 849-7100
petercalamari@quinnemanuel.com
manishasheth@quinnemanuel.com
isaacnesser@quinnemanuel.com

QUINN EMANUEL URQUHART
& SULLIVAN, LLP
K. John Shaffer (*pro hac vice*)
Matthew Scheck (*pro hac vice*)
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100
johnshaffer@quinnemanuel.com
matthewscheck@quinnemanuel.com

*Attorneys for Plaintiff ResCap Liquidating Trust*