# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| ResCap Liquidating Trust,<br><br>        Plaintiff,<br><br>v.<br><br>LendingTree, LLC, and<br>LendingTree, Inc.<br><br>        Defendants. | Case No. 19-cv-2360 (SRN/HB)<br><br><br>**ORDER** |

Isaac Nesser, Peter Evan Calamari, and Manisha M. Sheth, Quinn Emanuel Urquhart & Sullivan, LLP, 51 Madison Ave., 22nd Floor, New York, NY 10010; Matthew R. Scheck and Kenneth John Shaffer, Quinn Emanuel Urquhart & Sullivan, LLP, 865 S. Figueroa St., 10th Floor, Los Angeles, CA 90017; Donald G. Heeman, Jessica J. Nelson, and Randi J. Winter, Spencer Fane, 150 S. 5th St., Suite 1900, Minneapolis, MN 55402, for Plaintiff

Brandy Hutton Ranjan and Matthew Corcoran, Jones Day, 325 John H. McConnell Blvd., Ste. 600, Columbus, OH 43215; Carl E. Black, Jones Day, 901 Lakeside Ave., North Point, Cleveland, OH 44114; Kelly G. Laudon and Matthew Enriquez, Jones Day, 90 S. 7th St., Ste. 4950, Minneapolis, MN 55402, for Defendants

SUSAN RICHARD NELSON, United States District Judge

Before the Court is Defendants' Motion to Dismiss for Lack of Jurisdiction, Failure to State a Claim, or in the Alternative, to Compel Arbitration [Doc. No. 29].  For the reasons set forth below, Defendants' motion is denied.

## I. BACKGROUND

### A. Underlying Litigation

This case arises from an underlying contractual indemnification action filed in this District, *Residential Funding Co. v. Home Loan Ctr., Inc.*, 14-cv-1716 (SRN/HB). ResCap's predecessor in interest, Residential Funding Company ("RFC"), was a Delaware limited liability company, with its principal place of business in Minneapolis, Minnesota. (Compl. [Doc. No. 1] ¶ 11.) RFC was in the business of buying residential mortgage loans from "correspondent lenders," such as HLC, and distributing them by pooling them together with other mortgage loans to sell into residential mortgage backed securities ("RMBS") trusts or selling them to whole loan purchasers. (*Id.* ¶ 41.)

HLC is a California corporation with its principal place of business located in Charlotte, North Carolina. (*Id.* ¶¶ 16, 21.) It is a "second-generation Internet-based direct mortgage lender" that was incorporated in September 2000 under the name FreeApprovalFinder.com, Inc. (*Id.* ¶ 16.) In 2002, it changed its name to Home Loan Center, Inc. (*Id.* ¶¶ 16, 21.)

As a secondary market mortgage loan purchaser, ResCap asserts that the quality of the loans that it purchased from correspondent lenders was critical to its business success. (*Id.* ¶ 42.) Thus, in RFC's "Client Contract," corresponding Client Guide, and related documents with correspondent lenders, including HLC, it required the lenders to adhere to "stringent loan-level contractual representations and warranties designed to protect RFC from the risks of borrower fraud, appraisal fraud, failure to comply with state and federal law, and other credit and compliance factors that could negatively impact the performance

and value of the loans it purchased." (*Id.*) ResCap contends that the failure of correspondent lenders, such as HLC, to satisfy their representations and warranties led to the filing of numerous suits brought against RFC by investors in its RMBS, based on claims that the loans contained multiple defects, and suffered from fraud and compliance problems. (*Id.*)

Ultimately, RFC filed for chapter 11 bankruptcy in the United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court"). (*Id.* ¶ 43.) Numerous claimants, including investors, class action plaintiffs, monoline insurers, RMBS holders, and trustees, filed proofs of claim in Bankruptcy Court, alleging "tens of billions of dollars of damages stemming from defective loans, including those sold to RFC by HLC." (*Id.* ¶ 44.) After a long and intensive mediation, RFC settled its RMBS-related liabilities in Bankruptcy Court for over $10 billion of allowed claims. (*Id.* ¶ 45.) After a five-day confirmation trial, the Bankruptcy Court approved the settlements on December 11, 2013, and confirmed the Second Amended Joint Chapter 11 Plan. (*Id.*) As contemplated in the Plan and the Bankruptcy Court's confirmation order, ResCap was authorized to pursue litigation, including ResCap's underlying suit against HLC, and to distribute the proceeds to the debtors' creditors. (*Id.*)

To that end, in late 2013, RFC initiated the underlying lawsuit against HLC in Minnesota state court, asserting claims for breach of contract and contractual indemnification. (*Id.* ¶ 8.) Plaintiff removed the matter to this Court in 2014, and ResCap was ultimately substituted for RFC as the Plaintiff. (*Id.*) The ResCap litigation in the District of Minnesota, which included ResCap's lawsuits against numerous other loan

originators, lasted over five-and-a-half years. (*Id.* ¶ 46.) ResCap contends that during this time, it responded to over 1,000 written discovery requests, produced over three million documents (consisting of nearly 24 million pages), defended over 150 fact depositions noticed in the HLC case, and reviewed hundreds of thousands of third-party documents. (*Id.*) ResCap and HLC also engaged in three unsuccessful, court-supervised mediations. (*Id.*)

In April 2018, ResCap, HLC, and several other defendants filed cross motions for summary judgment and motions to exclude expert witnesses. (*Id.* ¶ 47.) The summary judgment briefing totaled nearly 600 pages, and, in addition to the "consolidated" briefing, HLC filed a defendant-specific memorandum, to which ResCap responded. (*Id.*) The Court heard approximately 15 hours of argument on the summary judgment and *Daubert* motions, after which it issued a 182-page opinion, granting some motions in favor of ResCap, some in favor of the defendants, and reserving a number of issues for trial. (*Id.*)

During the three-week trial, from October 15, 2018 to November 7, 2018, ResCap offered 15 fact witnesses, five expert witnesses, and approximately 55 exhibits. (*Id.* ¶ 50.) HLC cross-examined ResCap's witnesses and offered six fact witnesses, two expert witnesses, and approximately 40 exhibits. (*Id.*) At the end of trial, the Court granted judgment as a matter of law to ResCap on several issues, including the reasonableness of the Bankruptcy settlements, and HLC's equitable estoppel defense, but left several other issues for the jury to determine. (*Id.*) After two-and-a-half hours of deliberation, the jury returned a verdict of $28.7 million for ResCap. (*Id.*)

Post-trial, the Court granted ResCap's motions for pre-judgment and post-judgment interest and attorneys' fees. (*Id.* ¶ 51.) On June 21, 2019, the Court entered judgment in favor of ResCap, and against HLC, in the amount of $68,484,502.06. (*Id.*)

On July 19, 2019, HLC filed a notice of appeal with the Eighth Circuit Court of Appeals. (*Id.*) Two days later, HLC filed a chapter 11 bankruptcy petition in the Northern District of California. (*Id.*) At that time, HLC disclosed that it had approximately $11 million in assets, consisting of $5.4 million in cash, and the rest consisting of retainers paid to various restructuring professionals, an ownership interest in HLC Escrow, Inc., and certain tax attributes. (*Id.*) ResCap alleges that "[a]t no time during the pendency of the litigation did Defendants or HLC ever inform ResCap or the Court that HLC was insolvent or would be unable to pay any judgment entered." (*Id.*)

ResCap then filed this action for declaratory relief, asserting that Defendants LendingTree Parent and LendingTree Sub[1] are liable for the underlying judgment against HLC, as Defendants controlled HLC at all relevant times. (*Id.* ¶ 1.) ResCap alleges that LendingTree Parent expressly assumed HLC's relevant liabilities and is therefore liable as its successor, and that Defendants are both liable as alter egos of HLC under California law. (*Id.*)

---

[1]     Plaintiff refers to Defendant LendingTree, LLC as "LendingTree Sub," and Defendant LendingTree, Inc. as "LendingTree Parent." (Compl. at 1.) In general, the Court uses these terms in recounting the factual allegations, consistent with the language in the Complaint.

## B. HLC's Relationship with Defendants

ResCap alleges that in 2003, LendingTree Sub (then known as LendingTree, Inc.), entered into an Agreement and Plan of Merger with IAC/InterActiveCorp (then known as USA Interactive) ("IAC") and Forest Merger Corp. (*Id.* ¶ 3.) Pursuant to this Agreement, IAC acquired full ownership of LendingTree Sub, which changed its name to Tree, LLC in December 2004. (*Id.*)

ResCap further alleges that in 2004, LendingTree Sub acquired HLC. (*Id.* ¶ 4.) ResCap asserts that HLC functioned as a wholly-owned subsidiary of LendingTree Sub, which, in turn, is now a wholly-owned subsidiary of LendingTree Parent. (*Id.*) After the acquisition, ResCap alleges, LendingTree Sub operated its lending business through HLC. (*Id.* ¶ 22.) That business involved originating mortgage loans and selling the loans to secondary market purchasers, such as RFC. (*Id.*)

Douglas Lebda is the founder of the "LendingTree" business, and the chairman and chief executive officer of LendingTree Parent. (*Id.* ¶ 4.) ResCap alleges that at all relevant times, Lebda controlled both LendingTree Sub and HLC.[2] (*Id.*) Moreover, it alleges that following HLC's acquisition, "LendingTree Sub controlled every aspect of HLC's business."[3] (*Id.* ¶ 5.) In particular, ResCap asserts that LendingTree Sub caused HLC to

---

[2] ResCap believes that at all relevant times, Lebda has been a resident of North Carolina. (Compl. ¶ 18.)

[3] ResCap alleges, on information and belief, that LendingTree Sub's "domination and exploitation of HLC" is supported by the following facts: (1) LendingTree Sub operated HLC under the brand name "LendingTree Loans," and HLC did business as "LendingTree Loans"; (2) HLC's revenues were primarily derived from the origination and sale of branded "LendingTree Loans," which were primarily sourced from consumer loan requests

continue selling loans to the secondary mortgage market, including to RFC, and also "guaranteed the funding critical to the LendingTree Loans business." (*Id.* ¶ 5.)

In August 2008, pursuant to a written agreement, (the "Spin Agreement"), LendingTree Sub "spun off" from IAC, at which time Defendant LendingTree Parent (then Tree.com, Inc.) was incorporated and became the parent of LendingTree Sub. (*Id.* ¶ 6; Compl., Ex. 2 (Spin Agmt) [Doc. No. 1-2]) ResCap alleges that LendingTree Parent expressly agreed to assume HLC's liabilities, including liabilities related to "LendingTree Loans." (Compl. ¶ 6.)

ResCap alleges that in 2012, HLC sold almost all of its operating assets to Discovery Bank. (*Id.* ¶ 16.) However, it asserts, Tree.com, Inc. (now LendingTree Parent) retained all pre-closing liabilities, as well as repurchase, warranty, and indemnification liabilities associated with any HLC loans. (*Id.*) ResCap further contends that since 2012, HLC has conducted no new business, and "its principal and essentially only activity has been the litigation of claims arising from its origination and residential mortgage loans." (*Id.*)

In addition, ResCap asserts that before, during, and after the ResCap litigation, including after HLC filed for bankruptcy, Defendants represented that they were responsible for HLC's liabilities. (*Id.* ¶ 53.) Plaintiff points to several years of

---

that LendingTree's "family of websites and phone platforms" received; (3) the LendingTree network generated most of HLC's customer leads under the name "LendingTree Loans"; (4) only a small portion of HLC's customer leads came from non-LendingTree channels, and HLC only used its own brand name when offering loans through third party resources; (5) LendingTree Sub funded HLC's business through warehouse lines of credit entered into and/or guaranteed by LendingTree Sub.; and (6) LendingTree Sub would not allow HLC to retain sufficient capital or obtain sufficient credit to hold loans for longer than 30 days. (Compl. ¶ 23(a)–(f.).)

LendingTree Parent's annual filings with the SEC, attached as exhibits to the Complaint, in which LendingTree Parent stated that it would continue to be liable for HLC's repurchase and indemnification obligations. (*Id.* ¶¶ 54–58; *see also id.*, Exs. 1, 3–7.). Also, Plaintiff asserts that in LendingTree Parent's 2018 SEC 10-K filing, it disclosed the $28.7 million jury verdict against HLC, noting the possibility for a potential increase for both prejudgment interest and attorneys' fees. (*Id.* ¶ 57.) In that filing, LendingTree Parent further stated that it had incurred "substantial legal fees" in the HLC litigation, and the "ultimate outcome" of the ResCap litigation and other pending claims might have a "material and adverse effect on [LendingTree Parent's] business, financial condition and results of operations." (*Id.* ¶¶ 54–58; *see also id.*, Ex. 6 (LendingTree 2018 SEC Form 10-K).) Plaintiff further points to LendingTree Parent's SEC 10-Q filing for the second quarter of 2019, filed four days after HLC's bankruptcy. (*Id.* ¶ 58; *id.*, Ex. 7 (LendingTree 2019 SEC Form 10-Q).) In the 2019 filing, LendingTree Parent notes, among other things, that its losses from "discontinued operations" were "attributable to losses associated with the LendingTree Loans business formerly operated by our Home Loan Center, Inc., or HLC, subsidiary." (*Id.*, Ex. 7 (LendingTree 2019 SEC Form 10-Q) at 41.)

## C.    This Action and Defendants' Motion to Dismiss

As noted, in this action, ResCap seeks to hold Defendants liable for payment of the HLC judgment. In Count One of the Complaint, Plaintiff alleges that Tree-Inc. expressly assumed all of HLC's liabilities pursuant to the Spin Agreement. (Compl. ¶¶ 59–65.) In Count Two, Plaintiff asserts that LendingTree is liable for the HLC judgment as the alter

ego of HLC. (*Id.* ¶¶ 66–70.) In Count Three, Plaintiff alleges that HLC is liable as LendingTree's agent. (*Id.* ¶¶ 71–77.)

In lieu of filing an Answer to the Complaint, Defendants filed the instant motion, seeking to dismiss Counts One and Three. They do not move to dismiss Count Two. Defendants argue that Count One must be dismissed for lack of personal jurisdiction, and, under Rule 12(b)(6), they contend that ResCap has not alleged a plausible claim that RFC was an intended third-party beneficiary of the Spin Agreement. (Defs.' Mem. [Doc. No. 31] at 2.)

As to Count Three, Defendants argue that it must be dismissed for lack of personal jurisdiction. (*Id.*) In addition, they assert that Count Three fails to state a claim under Rule 12(b)(6), and is time-barred. (*Id.*) As to Rule 12(b)(6), Defendants argue that ResCap has not plausibly alleged that HLC was acting within the scope of its agency when it sold defective mortgage loans to RFC. (*Id.* at 2–3.) Also, Defendants assert that to the extent ResCap believed that HLC acted as LendingTree's agent when it sold loans to RFC, ResCap was required to bring those claims within a six-year limitations period, which expired in 2018. (*Id.* at 3.)

Finally, if the Court finds that Count One should not be dismissed, Defendants assert that the arbitration clause in the Spin Agreement requires arbitration of that claim. (*Id.* at 3–4.) If the Court grants their motion to arbitrate Count One, they ask that the Court stay the resolution of the remaining claims pending arbitration. (*Id.*)

## II.    DISCUSSION

### A.    Personal Jurisdiction

#### 1.    Standard of Review

To survive a motion to dismiss for lack of personal jurisdiction, "a plaintiff must make a prima facie showing that personal jurisdiction exists, which is accomplished by pleading sufficient facts to support a reasonable inference that the defendant can be subjected to jurisdiction within the state." *K–V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 591–92 (8th Cir. 2011) (citation and alterations omitted). This evidentiary standard is "minimal," although the pleadings may be "tested" with affidavits and exhibits supporting and opposing a Rule 12(b)(2) motion to dismiss. *Id.* at 592. A court must resolve all factual conflicts in the plaintiff's favor. *Fastpath, Inc. v. Arbela Techs. Corp.*, 760 F.3d 816, 820 (8th Cir. 2014). "[T]he action should not be dismissed for lack of jurisdiction if the evidence, viewed in the light most favorable to [the plaintiff], is sufficient to support a conclusion that the exercise of personal jurisdiction over [the defendant] is proper." *Creative Calling Sols., Inc. v. LF Beauty Ltd.*, 799 F.3d 975, 979 (8th Cir. 2015).

#### 2.    The Law of Personal Jurisdiction

##### a.    Minnesota's Long Arm Statute and Due Process

A court may exercise personal jurisdiction over a nonresident defendant if (1) Minnesota's long-arm statute, Minn. Stat. § 543.19, is satisfied, and (2) the exercise of personal jurisdiction does not offend due process. *Stanton v. St. Jude Med., Inc.*, 340 F.3d 690, 693 (8th Cir. 2003). Because Minnesota's long-arm statute extends the personal jurisdiction of Minnesota courts as far as due process allows, *Minnesota Min. & Mfg. Co.*

*v. Nippon Carbide Indus. Co.*, 63 F.3d 694, 697 (8th Cir. 1995), this Court need only evaluate whether the exercise of personal jurisdiction comports with the requirements of due process. *Creative Calling Sols.*, 799 F.3d at 979.

A court may exercise personal jurisdiction over litigating parties either under a theory of specific or general jurisdiction. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985). In *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014), the Supreme Court clarified that a court may only exercise general personal jurisdiction if a defendant's contacts are "so continuous and systematic as to render [it] essentially at home in the forum." (citing *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). The Court explained that a defendant's place of incorporation and principal place of business are the "paradigm all-purpose forums." *Id*. at 137 (citing *Goodyear*, 564 U.S. at 924). Moreover, foreign corporations should be able to engage in business transactions with some "minimum assurances as to where that conduct will and will not render them liable to suit." *Id*. at 139 (quoting *Burger King*, 471 U.S. at 472). The Supreme Court found that it is only in an "exceptional case" that a "corporation's operations in a forum other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporation at home in that State," so as to allow a court to exercise general personal jurisdiction. *Id*. at 139, n.19.

b.    **LendingTree Sub's Consent to General Personal Jurisdiction**

It is well established that consent is an independent basis for the exercise of personal jurisdiction. *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456

U.S. 694, 703 (1982). Consent to personal jurisdiction may be established in several ways, including as a condition of performing some activity in the state. *Id.* ("The actions of the defendant may amount to a legal submission to the jurisdiction of the court, whether voluntary or not."). As ResCap correctly notes, the Eighth Circuit has held that the appointment of an agent for service of process in Minnesota pursuant to state statutes constitutes consent to the general jurisdiction of Minnesota courts. *See Knowlton v. Allied Van Lines, Inc.*, 900 F.2d 1196, 1999-2000 (8th Cir. 1990) ("The whole purpose of requiring designation of an agent for service is to make a nonresident suable in the local courts.").

Neither Defendants are incorporated in Minnesota nor have their principal place of business located in the State. (Compl. ¶¶ 12, 14.) However, it is undisputed that LendingTree Sub has a registered agent for service of process in Minnesota. (Defs.' Mem. at 12 n.5; Pl.'s Opp'n [Doc. No. 46] at 8–9; Alden Decl. [Doc. No. 47], Ex. F (LendingTree, LLC's Service of Process Reg. Record)[4].) Plaintiff further alleges that LendingTree Sub registered in Minnesota in October 2005, and filed certificates of registered offices and/or agents in March 2013, September 2016, April 2017, February 2018, and August 2018. (Alden Decl., Ex. F (LendingTree, LLC's Service of Process Reg. Record).) Accordingly, Plaintiff argues that by maintaining its filing and designating a registered agent "long after *Knowlton* was decided[,]" LendingTree Sub has consented to the general personal

---

[4]     The Court takes judicial notice of filings with the Secretary of State. *See Noble Sys. Corp. v. Alorica Cent., LLC*, 543 F.3d 978, 982 (8th Cir. 2008).

jurisdiction of the Court. (Pl.'s Opp'n at 8–9 (citing *Am. Dairy Queen Corp. v. W.B. Mason Co.*, 2019 WL 135699, at *1, 6 (D. Minn. Jan. 8, 2019)).)

Defendants respond that a more restrictive interpretation of Minnesota's statute for service of process on a limited liability company, Minn. Stat § 322C.0116, is required because the statute "does not expressly mention consent to personal jurisdiction." (Defs.' Mem. at 12 n.5). Nonetheless, Defendants' counsel acknowledged at oral argument that the Court was bound by *Knowlton*, but preserved their "rights to appeal [this] issue at the appropriate time." (Jan. 16, 2020 Hr'g Tr. [Doc. No. 71] at 16; *see also* Defs.' Mem. at 12 n.5.)

The parties agree that *Knowlton* controls here, and *Knowlton* makes clear that "consent is an independent basis for jurisdiction." *See Am. Dairy Queen Corp.*, 2019 WL 135699, at *6 (interpreting *Knowlton*). By registering under Minn. Stat § 322C.0116, LendingTree Sub has consented to the general personal jurisdiction of the Court. And as this Court has recognized, because "*Knowlton* has been good law since 1991 . . . any foreign corporation who registers here, [] is consenting to general personal jurisdiction in the forum." *Id*.

Accordingly, the Court has general personal jurisdiction over LendingTree Sub. Alternatively, the Court has personal jurisdiction over LendingTree Sub (and LendingTree Parent) by virtue of the forum selection clause in the Client Contract between RFC and HLC, as addressed further below.

### 3.    Client Contract's Forum Selection Clause

The forum selection clause in the Client Contract between RFC and HLC explicitly requires the parties to submit "to the jurisdiction of any . . . federal court located in Hennepin County, Minnesota[.]"  (Alden Decl., Ex. A (May 6, 2002 Client Contract between RFC & HLC) ¶ 12.)  It is undisputed that the forum selection clause in the Client Contract is valid and enforceable as to HLC.  Where the parties disagree, however, is whether Defendants may also be bound—by virtue of their relationship with HLC—to the terms of that clause.  ResCap argues that Defendants are bound by this clause for three reasons.  First, ResCap contends that its "allegations of successor liability [against LendingTree Parent] establish personal jurisdiction[.]"  (Pl.'s Opp'n at 9–10.)  Second, ResCap argues that Defendants are "closely related" to HLC, and thus bound by the forum selection clause.  (*Id.* at 10–11.)  Third, ResCap asserts that the Court should "impute the contacts" of HLC to Defendants because Defendants "dominated and controlled" HLC.  (*Id.* at 11–12.)

Defendants counter that these reasons fail to establish personal jurisdiction over both LendingTree Parent and LendingTree Sub.  As an initial matter, Defendants contest whether Count One (asserted against LendingTree Parent only) actually asserts a successor liability claim.  (Defs.' Reply [Doc. No. 60] at 4–5.)  Even if it does, Defendants argue that the claim is not viable because ResCap fails to allege that HLC transferred its assets to LendingTree Parent.  (*Id.*)  Instead, Defendants assert, the Complaint only alleges that HLC continued to sell loans to RFC pursuant to the Client Contract for four years after the Spin

Agreement and that, in the summer of 2012, HLC sold all of its operating assets to Discover. (*Id.* (citing Compl. ¶¶ 16, 37, 41).)

Regarding ResCap's allegations that Defendants are "closely related" to HLC, Defendants contend that the Eighth Circuit requires that the "particular dispute also be closely related to the contract containing the forum-selection clause." (*Id.* at 5 (citing *Marano Enters. of Kan. v. Z-Teca Rests., L.P.*, 254 F.3d 753, 757 (8th Cir. 2001).) Arguing that the disputes in Counts One and Three are "not closely related to the Client Contract," Defendants assert that the forum-selection clause in the Client Contract does not bind the parties. (*Id.*) Finally, as for "imputing the contacts" of HLC to LendingTree Parent and LendingTree Sub, Defendants contend that ResCap fails to cite any authority that enforces a forum-selection clause against the parent alleged to dominate and control the subsidiary. (*Id.* at 5–6.)

As an initial step, the Court must determine which state's law to apply to the successor liability and agency-theory analyses. For the successor liability analysis, ResCap's counsel stated at oral argument that the Court could plausibly apply either: (1) the forum law of Minnesota; (2) Delaware law, as provided in the choice-of-law provision in the Spin Agreement; or (3) the forum law of the principal place of Defendants' business or HLC's place of incorporation, North Carolina or California, respectively. (Jan. 16, 2020 Hr'g Tr. at 26.) In contrast, Defendants appear to posit that only Delaware law should apply to ResCap's successor-liability analysis. (*See* Defs.' Mem. at 16.) Neither party necessarily advocates for two of the states above—California or North Carolina—and the

Court agrees that the laws of Minnesota and Delaware appear to be most strongly in contention.

Defendants argue that Delaware law should apply to the successor-liability analysis based, in part, on the terms of the Spin Agreement. At the hearing on the present motion, ResCap's counsel contended that the Spin Agreement "describes the relationship between [LendingTree Parent] and HLC." (Jan. 16, 2020 Hr'g Tr. at 28.) ResCap asserts that Defendants structured the Spin Agreement so that they expressly assumed HLC's liability, giving rise to successor liability under common law. (Pl.'s Opp'n at 2.) Thus, the interpretation of the Spin Agreement appears relevant to this dispute.[5]

In deciding conflict of law questions, a federal district court sitting in Minnesota applies Minnesota's conflict of law rules. *See Atl. Marine Const. Co., Inc. v. U.S. Dist. Court for W. Dist. of Texas*, 571 U.S. 49, 65, 134 S. Ct. 568, 582 (2013) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Under Minnesota's choice-of-law analysis for substantive law, courts first consider whether there is an actual conflict between the law of two states. *State Farm Mut. Auto. Ins. Co. v. Great W. Cas. Co.*, 623 N.W.2d 894, 896 (Minn. 2001) (citing *Myers v. Gov't Emp. Ins. Co.*, 225 N.W.2d 238, 241 (Minn. 1974)). On the surface, it appears that the laws of Delaware and Minnesota differ as to successor liability. Delaware law permits a party to pursue successor liability on four traditional common law bases: (1) the buyer's express assumption of liability (as ResCap alleges here); (2) *de facto* merger or consolidation; (3) mere continuation of the predecessor

---

[5] Although relevant to this claim, as discussed further below, the Court finds that ResCap sufficiently pleads that it is suing pursuant to the Client Contract for Count One.

under a different name; or (4) fraud. *Ross v. Desa Holdings Corp.*, No. 05C-05-013 MMJ, 2008 WL 4899226, at *4 (Del. Super. Ct. Sept. 30, 2008). In Minnesota, pursuant to Minn. Stat. § 302A.661, subd. 4, successor liability is generally limited to circumstances in which there has been a contractual assumption of liability, or where liability is otherwise permitted by statute.[6] *See Stoebner v. Opportunity Fin., LLC*, 562 B.R. 368, 381 (D. Minn. 2016) (comparing Delaware law and Minnesota successor liability law). As ResCap notes, however, the difference in the scope of the two states' laws is inconsequential here because ResCap's theory of successor liability—express contractual assumption—is a viable theory under both states' laws.

Similarly, for ResCap's agency theory, Minnesota and Delaware law do not appear to conflict. *Compare Hutar v. Capital One Fin. Corp.*, No. 15-cv-2100 (MJD/JJK), 2015 WL 4868886, at *7 (D. Minn. July 27, 2015) (Keyes, Mag. J.) (noting federal common law elements of agency relationship based on Restatement (Second) of Agency, and their

---

[6]    Revisions to Minn. Stat. Minn. Stat. § 302A.661, subd. 4, in 2006 appear to have eliminated de facto merger and the mere continuation basis for successor liability. *See Matson Logistics, LLC v. Smiens*, No. 12-cv-400 (ADM/JJK), 2012 WL 2005607, at *9 (D. Minn. 2012) (concluding 2006 amendment to § 302A.661, subd. 4 "clearly abrogates the common law exceptions of de facto merger and mere continuation" for successor liability claims). However, the Court notes that two decisions by the Minnesota Court of Appeals have since applied de facto merger and continuation exceptions for successor liability claims. *See Johnson v. USL Prods., Inc.*, No. A11-1774, 2012 WL 2078478, at *5–7 (Minn. Ct. App. June 11, 2012) (acknowledging Minn. Stat. § 302A.661, subd. 4, then discussing de facto merger and mere continuation theories), *rev. denied*, (Minn. Aug. 21, 2012); *Noack v. Colson Constr., Inc.*, No. A08-0148, 2009 WL 305114, at *9 (noting Minnesota permits all four exceptions for successor liability claims), *rev. denied*, (Minn. Apr. 21, 2009). While neither decision of the Court of Appeals has been overruled, both have been criticized. *See In re Opus East, LLC*, 528 B.R. 30, 81–82 (Bankr. D. Del. 2015) (conducting analysis of why *Johnson* and *Noack* incorrectly recited Minnesota law).

general consistency with Minnesota law on agency relationships), *adopted in full*, 2015 WL 4937347 (D. Minn. Aug. 12, 2015), *with Fisher v. Townsends, Inc.*, 695 A.2d 53, 57–58 (Del. 1997) (discussing the "generic" nature of a principal/agent relationship, and citing Restatement (Second) of Agency).

Accordingly, because the laws of both states would produce the same result for the theories asserted in Counts One and Three of the Complaint, there is no real conflict, and the Court need not resolve the question of whether Minnesota or Delaware law applies. *See Leonards v. S. Farm Bureau Cas. Ins. Co.*, 279 F.3d 611, 612 (8th Cir. 2002) (declining to decide choice-of-law issue where state's laws were the same, creating a "false conflict" on the issue); *Cent. States Se. & Sw. Areas Pension Fund v. King Dodge, Inc.*, 835 F.2d 1238, 1239 (8th Cir. 1987) (declining to decide which state's law applied where they were the same); *see also Merry v. Prestige Capital Mkts., Ltd.*, 944 F. Supp. 2d 702, 713 (D. Minn. 2013) (noting that where law is the same, "[t]he Court need not decide which state's law to apply").

The Court therefore first addresses the jurisdictional question of whether ResCap has adequately pleaded express assumption of liability—the basis for successor liability alleged against LendingTree Parent here. If ResCap successfully meets its burden of alleging successor liability, the parties do not dispute that LendingTree Parent is bound by the Client Contract's forum selection clause. The Court further addresses whether ResCap has sufficiently pleaded that the Client Contract's forum selection clause binds both Defendants by virtue of their relationship with HLC. Finally, the Court addresses whether

the Complaint alleges sufficient contacts for the Court to exercise specific jurisdiction over Defendants.

### a. LendingTree Parent (Count One)

Well-pleaded allegations of successor liability can establish personal jurisdiction. *See In re RFC & ResCap Liquidating Tr. Litig.*, No. 13-cv-3451 (SRN/HB), 2017 WL 1483374, at *9 (D. Minn. Apr. 25, 2017) (finding Plaintiff adequately alleged fraudulent transfer-based successor liability and therefore "set forth a prima facie case of personal jurisdiction"); *Massi v. Holden*, No. 09-cv-1821 (MJD/JJG), 2011 WL 6181258, at *5 (D. Minn. Dec. 13, 2011) (finding, under Minnesota law, that exercising personal jurisdiction over corporate successor based on its predecessor's contacts with the forum was proper); *see also Leon v. Shmukler*, 992 F. Supp. 2d 179, 190 (E.D.N.Y. 2014) (finding it is "well settled" that when a court has personal jurisdiction over a predecessor, it "gains personal jurisdiction over [the successor]"); *Aguas Lenders Recovery Grp. v. Suez, S.A.*, 585 F.3d 696, 701 (2d Cir. 2009) ("[I]f successorship is established, a non-signatory is subject to the . . . presumption of the enforceability of mandatory forum selection clauses).

Comparing the elements of successor liability to the allegations contained in the Complaint, the Court concludes, at the outset, that ResCap has met its burden of pleading this claim. The Complaint adequately pleads that LendingTree Parent became HLC's successor by assuming its liabilities in the Spin Agreement—liabilities that ultimately included the HLC Judgment. (*See* Compl. ¶¶ 24–34, 59–65.) And as explained further below, contrary to Defendants' assertions, (Defs.' Reply at 4), the Complaint sufficiently alleges a successor-liability claim, even if ResCap did not allege that HLC transferred its

assets to LendingTree Parent.  At this early stage, such allegations are sufficient to meet ResCap's jurisdictional burden.

### b.      LendingTree Parent and LendingTree Sub

ResCap argues that Defendants are further bound by the Client Contract's forum-selection clause because Defendants are "closely related" to HLC, and they "dominated and controlled" HLC.  (Pl.'s Opp'n at 22.)

### i.      Closely-Related Doctrine

First, the Eighth Circuit recognizes that parties "closely related" to the dispute are bound by forum-selection clauses.  *Marano Enters.*, 254 F.3d at 757.  Given the numerous allegations in the Complaint concerning the connections between Defendants and HLC, (*see, e.g.*, Compl. ¶¶ 14, 15, 23, 40), Defendants do not appear to contest they are "closely related" to HLC.  However, Defendants contend that *Marano* further requires that "the particular dispute be closely related to the contract containing the forum-selection clause." (Defs.' Reply at 5 (citing *Marano*, 254 F.3d at 757).)  Defendants therefore argue that the allegations in Count One are not bound to the forum selection clause in the Client Contract because Count One concerns " a dispute about the meaning of the Spin Agreement, not the Client Contract."  (*Id.*)  Defendants further argue that the allegations in Count Three (asserted against both Defendants) are also not bound to the Client Contract, but instead involve "unidentified contract(s) that ResCap has not alleged contain a forum-selection clause." (*Id.*)

The Court disagrees with Defendants.  Even under Defendants' reading of *Marano*, at this stage of the case, ResCap plausibly alleges that ResCap's claims are pursuant to the

Client Contract. For its successor-liability claim, ResCap persuasively argues that it "is *not* suing on the Spin Agreement." (Jan. 16, 2020 Hr'g Tr. at 28.) Rather, the Spin Agreement is relevant to the extent that it describes the relationship between Defendants and HLC. As discussed further below, courts have recognized this distinction when applying successor liability based on an express assumption of liability. *See*, *e.g.*, *Haywin Textile Prods., Inc. v. Int'l Fin. Inv.*, No. 00 Civ. 8633 RLC, 2001 WL 984721, at *4 (S.D.N.Y. Aug. 24, 2001), *aff'd*, 38 F. App'x 96 (2d Cir. 2002) ("When a party sues claiming that the defendant is a successor-in-interest . . . his argument is not premised upon his particular status, but rather upon the defendant's position of exposure to general liability for the debts of the predecessor"); *Heritage Realty Mgmt., Inc. v. Symbiot Snow Mgmt. Network, LLC*, No. 06047 Erie, 2007 WL 2903941, at *6 (W.D. Penn. Sept. 28, 2007) (noting that plaintiff is "only relying on the contract to demonstrate that [defendant] expressly assumed a portion of the [plaintiff's] liability, as required to make out a claim of express assumption successor liability.").

A similar situation is presented here, where ResCap argues that it is only relying on the Spin Agreement to demonstrate that LendingTree Parent expressly assumed the liabilities of HLC, including the HLC judgment. Its' claim, however, is based on HLC's "sale of defective loans, prior to the Spin Agreement, and its obligation to indemnify Plaintiff for liabilities incurred in RFC's bankruptcy, each pursuant to the Client Contract." (Pl.'s Opp'n at 19–20; *see*, *e.g.*., Compl. ¶¶ 20, 32, 34, 38, 53–58.) Thus, the Court finds that LendingTree Parent was bound by the Client Contract's forum selection clause because this contract was "closely related" to the dispute.

As for Count Three, in viewing the record in the light most favorable to ResCap, the Court finds that ResCap plausibly alleges that the Client Contract was also "closely related" to the dispute. The Complaint alleges that: (1) Defendants, as principals, are liable for causing HLC, their agent, to originate and sell defective mortgage loans to RFC in breach of applicable representations, including under the Client Contract, (Compl. ¶¶ 5, 8, 35–36, 42, 72–74; Ex. 9 (*Residential Funding Co., LLC v. Home Loan Ctr., Inc.*, Pl.'s First Am. Comp.)); (2) the breaches occurred when each defective mortgage loan was sold to RFC, (Compl. ¶¶ 35–36, 42); (3) HLC failed to satisfy its contractual obligation to indemnify RFC for the losses and liabilities it incurred based on these defective loans, (*id.* ¶¶ 2, 8, 17, 40); and (4) these acts took place while Defendants controlled and dominated HLC, and were within HLC's authority, (*id.* ¶¶ 5, 23, 75). As such, the Court finds that, even under Defendants' interpretation of Eighth Circuit precedent, the closely-related doctrine binds Defendants here.

### ii.       Control and Domination Test

The parties dispute whether the Court has authority to impute a subsidiary's contacts when assessing personal jurisdiction over Defendants. (Defs.' Reply at 6; *see* Pl.'s Opp'n at 11–12 (citing *Epps v. Stewart Info. Servs. Corp.*, 327 F.3d 642 (8th Cir. 2003); *George v. Uponor Corp.*, 988 F. Supp. 2d 1056 (D. Minn. 2013)). Defendants assert that none of ResCap's cited authority enforced a forum-selection clause against the parent alleged to have "dominated and controlled" the subsidiary. Defendants therefore argue that there is no basis to enforce the forum-selection clause here. (Defs.' Reply at 6–7.)

Defendants' reading of the law is too narrow. For instance, in *Epps*, 327 F.3d at 649, the Eighth Circuit concluded that the parent still could be subject to personal jurisdiction when the "corporation through the activities of another corporation has subjected itself to jurisdiction in a state under its long arm statute." And in *Viasystems, Inc. v. EBM-Papst*, 646 F.3d 589, 596 (8th Cir. 2011), on which Defendants rely, the Eighth Circuit rejected a bright-line factual inquiry, holding that "[d]etermining the propriety of jurisdiction at a particular place always involves applying principles of fairness and reasonableness to a distinct set of facts, and the determination is not readily amenable to rigid rules that can be applied across the entire spectrum of cases." (citing *Anderson v. Dassault Aviation*, 361 F.3d 449 (8th Cir. 2004)). To establish jurisdiction in this context, a "rigid satisfaction of the alter ego test" is not necessary. *See Uponor*, 988 F. Supp. 2d at 1064 (citing *Viasystems,* 646 F.3d at 1064).

Here, through HLC's contacts, including the Client Contract's forum-selection clause, Plaintiff has pleaded facts that sufficiently support a prima facie showing of personal jurisdiction. LendingTree Parent wholly owns LendingTree Sub, which wholly owns HLC. (Compl. ¶ 68(a).) ResCap alleges, and Defendants do not dispute, that each company in the chain wholly owns the respective company below.

More importantly, ResCap alleges that Defendants' contacts with Minnesota go well beyond "mere ownership" of HLC. *Epps*, 327 F.3d at 649. In fact, ResCap asserts that Defendants controlled virtually every aspect of HLC's business. (Compl. ¶¶ 5, 74.) Defendants allegedly caused HLC to "source mortgage loans from LendingTree's family of websites" and "phone platforms." (*Id*. ¶¶ 5, 23(a), 75(a).) ResCap further alleges that

Defendants caused HLC to brand loans under the "LendingTree Loans" name. (*Id.* ¶ 75.) Defendants also allegedly caused HLC to sell loans to purchasers in the secondary market, including RFC. (*Id.* ¶ 5.) "Most of HLC's customer leads" were allegedly "generated by the LendingTree network." (*Id.* ¶¶ 23(c), 75(d).) ResCap further alleges that Defendants "funded HLC's business, through warehouse lines of credit or debt guarantees." (*Id.* ¶¶ 5, 23(e), 75(e).) And Defendants allegedly would "not permit HLC to retain sufficient capital or obtain sufficient credit to hold onto loans for longer than 30 days." (*Id.* ¶¶ 5, 23(e), 75(e).)

Although Defendants rely on *Viasystems*, 646 F.3d 589, to suggest that the Court can only impute HLC's contacts to Defendants if ResCap "pierce[s] the corporate veil,'" (Defs.' Reply at 6–7), Defendants concede that the standard applied in *Uponor*, 988 F. Supp. 2d at 1064, was not so rigid. (Defs.' Reply at 7.) The Court agrees with the Court in *Uponor*, and finds that Defendants' view overstates the Eighth Circuit's ruling in *Viasystems*. In *Viasystems*, the court held that in order to impute a subsidiary's contacts with the forum state through an agency theory, the parent must exercise "a degree of control and domination" over the subsidiary, which it found "absent" in that case. 646 F.3d at 596. Notably, the court found jurisdiction lacking partly because the parent company's ownership interest in the subsidiary was "confined to a two-steps-removed 28–percent interest." *Id.* at 597 (noting further that parent had "no control or authority" over subsidiary and "no directors or officers in common" with subsidiary).

Unlike the situation in *Viasystems*, here, there is no "dilution" in ownership between HLC and Defendants. As Plaintiff alleges, Defendants controlled "every aspect" of HLC's

business.  Moreover, Plaintiff identifies Douglas Lebda—the CEO, chairman, and a shareholder of LendingTree Parent—as LendingTree Sub's sole manager, and HLC's sole director (until February 2019).  (Compl. ¶¶ 14, 15.)  Plaintiff alleges that Lebda participated in decision-making in the ResCap litigation, and that Defendants guaranteed payment of HLC's legal expenses in the underlying case.  (*Id.* ¶¶ 15, 40.)  Accordingly, the allegations in the Complaint sufficiently plead that Defendants exercised a sufficient "degree of control and domination" over HLC.  The Court therefore imputes HLC's contacts to Defendants such that the forum-selection in the Client Contract applies to Defendants.

### iii.    Specific Personal Jurisdiction

As for Count Three, ResCap contends that personal jurisdiction does not rest exclusively on the Client Contract's forum selection clause.  Rather, it argues, Defendants are subject to specific jurisdiction because the Complaint alleges that they had sufficient contacts with Minnesota.  The Court agrees.

"Sufficient contacts exist when the defendant's conduct and connection with the forum state are such that [it] should reasonably anticipate being haled into court there, and when maintenance of the suit does not offend traditional notions of fair play and substantial justice."  *Coen v. Coen*, 509 F.3d 900, 905 (8th Cir. 2007) (quotations omitted).  If a defendant "purposefully directed its conduct into the forum State," the suit "arise[s] out of or relate[s] to the defendant's contact with the forum," and the exercise of jurisdiction is reasonable, then a court may exercise specific jurisdiction over the defendant.  *Bristol-Myers Squibb Co. v. Superior Court of Cal., S.F. Cty.,* 137 S. Ct. 1773, 1780 (2017).  To make this determination, the Eighth Circuit considers five factors relevant to personal

jurisdiction: (1) the nature and quality of the defendants' contacts with the forum state; (2) the quantity of contacts with the forum state; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties. *See Wells Dairy, Inc. v. Food Movers Int'l, Inc.*, 607 F.3d 515, 518 (8th Cir. 2010) (citing *Bell Paper Box, Inc. v. U.S. Kids, Inc.*, 22 F.3d 816, 819 (8th Cir. 1994)). "The first three factors are closely related and are of primary importance, while the last two factors are secondary." *Pecoraro v. Sky Ranch for Boys, Inc.*, 340 F.3d 558, 562 (8th Cir. 2003) (citing *Digi–Tel Holdings, Inc. v. Proteq Telecomm. (PTE), Ltd.*, 89 F.3d 519, 523 (8th Cir. 1996)).

The Court concludes that the three main jurisdictional factors—the nature, quality, and quantity of the defendant's contacts with the forum, and the relation of those contacts to the cause of action—weigh in favor of exercising specific personal jurisdiction over Defendants. According to the Complaint, after Defendants acquired HLC, they "controlled every aspect of HLC's business," caused it to operate under the brand name "LendingTree Loans," funded HLC's business through warehouse lines of credit, and caused HLC to originate loans and sell them to purchasers, including RFC, which had its principal place of business in Minnesota. (Compl. ¶¶ 11, 23, 74.) Defendants allegedly dominated and controlled HLC while it sold over 6,200 loans to RFC in Minnesota, which gave rise to RFC's indemnification claim and ultimately resulted in the Judgment against HLC. (*Id.* ¶ 35.) Defendants also controlled HLC when HLC allegedly repudiated its indemnification obligations to Plaintiff. Further, Defendants allegedly assumed HLC's repurchase and indemnification obligations to RFC arising out of HLC's sale of mortgages to RFC in

Minnesota. (*Id.* ¶¶ 60, 62.); *see also Mid-Continent Eng'g, Inc. v. Toyoda Mach. USA, Corp.*, No. 07-cv-3892 (DSD/SRN), 2009 WL 1272142, at *3–4 (D. Minn. May 5, 2009) (finding predecessor's contacts with Minnesota attributable to successor company for purposes of specific jurisdiction, based on successor's assumption of predecessor's liabilities).

Additionally, for the three main factors, Defendants do not challenge personal jurisdiction as to Count Two, and the factual allegations underlying Counts Two and Three overlap. For example, both counts allege that Defendants dominated and controlled HLC, causing it to operate under the brand name "LendingTree Loans." (Compl. ¶¶ 68, 75.) Similarly, both counts allege that the vast majority of HLC's customer leads were originated by the LendingTree network of websites and phone platforms, and that Defendants funded HLC's business. (*Id.*; *compare* Count Two (¶¶ 66–70), *with* Count Three (¶¶ 71–77).) The Court finds this factual overlap relevant to its analysis of specific jurisdiction. *See*, *e.g.*, *Apostolou v. Mann Bracken, LLC*, No. 07-4950 (PGS), 2009 WL 1312927, at *7 (D. N.J. May 1, 2009) ("Once, however, specific jurisdiction is established with respect to one or more claims, it may be unnecessary to engage in an independent analysis for remaining factually overlapping claims.") (quotation omitted).

The two remaining, secondary factors—the interest of the forum and the convenience of the parties—also weigh in favor of exercising jurisdiction over Defendants. Minnesota "has an obvious interest in providing a local forum in which its residents may litigate claims," *Creative Calling Sols.*, 799 F.3d at 982 (citing *Digi–Tel Holdings,* 89 F.3d at 525), and Defendants' own actions suggest that Minnesota is a convenient forum.

LendingTree Sub allegedly guaranteed the payment of HLC's legal expenses in the underlying case, and the chairman of LendingTree Parent and LendingTree Sub's sole manager participated in decision-making in the ResCap Litigation. Defendants therefore cannot credibly claim that Minnesota is an inconvenient forum. The Court finds that Defendants' own contacts with Minnesota are sufficient for specific personal jurisdiction.

Alternatively, the Court imputes HLC's substantial contacts with the state to Defendants. As explained above, imputation of a subsidiary's forum contacts is appropriate where a plaintiff alleges that the parent dominated and controlled the subsidiary. *Viasystems*, 646 F.3d at 596; *Uponor*, 988 F. Supp. 2d at 1064. In *Scott v. Mego International, Inc.*, 519 F. Supp. 1118 (D. Minn. 1981), a case on which ResCap relies, the plaintiff brought an action against a parent and its subsidiary. The defendants then moved to dismiss for lack of personal jurisdiction, but the court denied the motion based on "the nature of the parent-subsidiary relationship and the activities in Minnesota of the wholly owned subsidiary." *Id*. at 1126. The parent corporation in *Scott*: (1) conducted its business through wholly-owned subsidiaries; (2) maintained offices in the same location as the subsidiary; (3) had the same directors as the subsidiary and shared officers with the subsidiary; (4) issued consolidated financial statements with the subsidiary; and (5) guaranteed the subsidiary's credit facilities. *Id*. Here, ResCap has alleged similar facts. (Compl. ¶¶ 23, 39, 68, 75); *see also JL Schweiters Constr., Inc. v. Goldridge Constr., Inc.,* 788 N.W.2d 529, 536–37 (Minn. Ct. App. 2010) (finding the exercise of personal jurisdiction over parent based on subsidiary's contacts with Minnesota

was proper where parent wholly owned the subsidiary, guaranteed the subsidiary's debts, and "exerted substantial control" over the subsidiary).

In response, Defendants argue that "ResCap does not plausibly allege" any agency relationship because it "fails to allege that Defendants granted HLC the authority to bind Defendants or any of *its* duties to HLC, from which that authority could be implied." (Defs.' Reply at 7–8.) In addition, they argue that due process precludes ResCap from establishing personal jurisdiction here via the HLC Judgment. (Defs.' Mem. at 15.)

Regarding the allegations of the agency relationship, Defendants concede that "actual authority may be express or implied." *See Protege Biomedical, LLC v. Z-Medica, LLC,* 394 F. Supp. 3d 924, 937 (D. Minn. 2019). As discussed further below, the Complaint sufficiently alleges, at a minimum, that Defendants granted authority to HLC to act on their behalf because they expressly delegated to HLC the authority to: (1) source mortgage loans from LendingTree's family of websites under the "LendingTree Loans name"; and (2) sell loans in the secondary market under the "LendingTree Loans" brand. (Compl. ¶¶ 5, 72–75.) These duties demonstrate that HLC had the "implied authority" to act on Defendants' behalf. *Protege Biomedical, LLC*, 394 F. Supp. 3d at 937; (*see also* Jan. 16, 2020 Hr'g Tr. at 33 ("[D]efendants recognize that the authority to act on one's behalf can be express or implied. And here [Plaintiff] alleges that it was implied[.]").)

Likewise, although Defendants assert that the HLC Judgment cannot establish personal jurisdiction, Plaintiff sufficiently alleges that Defendants were in privity with

HLC, as noted below. Accordingly, the Court concludes that it has specific personal jurisdiction over Defendants.[7]

### B.      Dismissal under Rule 12(b)(6)

Defendants also move to dismiss Counts 1 and 3 of the Complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6). (*See* Defs.' Mem. at 15–18, 23–26.) Federal Rule of Civil Procedure 8(a)(1)–(3) requires that a complaint set forth "a short and plain statement" of "the grounds for the court's jurisdiction," the "claim showing that the pleader is entitled to relief," and "a demand for the relief sought, which may include relief in the alternative or different types of relief." A party who believes that a pleader has failed to do so may file a motion to dismiss under Fed. R. Civ. P. 12(b)(6), which permits dismissal where the plaintiff has failed "to state a claim upon which relief can be granted." When evaluating a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court assumes the facts in the complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the plaintiff. *Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1013 (8th Cir. 2013). In doing so, however, the Court is not required to defer to legal conclusions or "formulaic recitation[s] of the elements of a cause of action." *Lustgraaf v. Behrens*, 619 F.3d 867, 873 (8th Cir. 2010).

---

[7]      Defendants also assert that the Court lacks subject matter jurisdiction, but are "not moving to dismiss on this ground at this time." (Defs.' Mem. at 9 n.4.) Although Defendants argue that subject matter jurisdiction is lacking, they acknowledge that the Court has previously found "related to" subject matter jurisdiction in prior ResCap cases. (*Id.* (citing *ResCap Liquidating Tr. v. U.S. Bank, N.A.*, Nos. 16-cv-4067 (PAM/HB), 17-cv-197 (PAM/HB), 17-cv-198 (PAM/HB), 2017 WL 2437242, at *2–3 (D. Minn. June 5, 2017); *In re RFC & ResCap Liquidating Tr. Litig.*, No. 13-cv-3451, 2015 WL 2373401, at *4–6 (D. Minn. May 18, 2015).)

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), and consequently permit a claim to advance into discovery, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Neubauer v. FedEx Corp.*, 849 F.3d 400, 404 (8th Cir. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facial plausibility exists when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). While the plausibility standard is "not akin to a probability requirement," it necessarily requires a complaint to present "more than a sheer possibility that a defendant has acted unlawfully." *Id.*

When considering a motion to dismiss under Rule 12(b)(6), "the court generally must ignore materials outside the pleadings." *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999). Courts may, however, "consider the pleadings themselves, materials embraced by the pleadings, exhibits attached to the pleadings, and matters of public record." *Illig v. Union Elec. Co.*, 652 F.3d 971, 976 (8th Cir. 2011) (citation omitted) (internal quotation marks omitted). Here, the exhibits to the Complaint, which include the Spin Agreement, are referenced in the Complaint, and are embraced by the pleadings. Accordingly, the Court will consider these documents in determining whether ResCap states a claim upon which relief can be granted.

### 1. Count One – Declaratory Relief Based on Successor Liability

Count 1 of Plaintiff's complaint seeks declaratory relief against LendingTree Parent for the HLC Judgment because LendingTree Parent "has expressly assumed," by way of

the 2008 Spin Agreement, "HLC's repurchase and indemnification liabilities, including, specifically, the liabilities reflected in the Judgment." (Compl. ¶ 60.) In support, ResCap alleges that when LendingTree Sub was spun off from IAC, LendingTree Parent expressly agreed to assume all of HLC's liabilities related to LendingTree Loans, which was HLC's "doing business as" name. (*Id.* ¶ 61.) ResCap further cites to post-2008 SEC filings by LendingTree Parent in which LendingTree Parent purportedly continued to assert that it had assumed, or continued to remain liable, for HLC's liabilities, (*see id.* ¶ 62), as well as other asset sale agreements, repurchase agreements, and warehouse credit facilities between HLC and third parties that Defendants purportedly guaranteed because they knew they were responsible for HLC's repurchase obligations. (*Id.* ¶¶ 63–64.)

### a.    Parties' Arguments

Defendants contend that Plaintiff's claim is premised upon "a theory that [LendingTree Parent] assumed the repurchase liabilities of HLC under the Spin Agreement," and that because that Agreement requires that it be interpreted in accordance with Delaware law, Delaware law applies. (Defs.' Mem. at 16.) Defendants argue that because ResCap was not a party to the Spin Agreement, under Delaware law, it cannot benefit from the contract's terms. (*Id.*) Moreover, Defendants contend, ResCap was not an intended third-party beneficiary of the contract. (*Id.* at 16–17.) Defendants contend that aside from failing to sufficiently allege third-party beneficiary status under Delaware law (*see id.* at 16–17 (quoting *Reserves Dev. LLC v. Severn Sav. Bank*, 2007 WL 4054231, at *18 (Del. Ch. Nov. 9, 2007))), ResCap also cannot escape the Spin Agreement's "no intended third-party beneficiary" clause, which conclusively demonstrates that the

contracting parties did not intend to create any third-party beneficiaries or rights enforceable by third parties. (*Id.* at 17–18 (citations omitted).)

ResCap responds that LendingTree misunderstands the nature of Count One. It notes that it is not suing as a party or third-party beneficiary to the contract, but rather based on LendingTree Parent's position as HLC's successor-in-liability in light of its express assumption of HLC's liabilities in the Spin Agreement. (Pl.'s Opp'n at 18 (citing Compl., Ex. 2 (Spin Agmt.).) ResCap argues it is not suing on the Spin Agreement itself, but rather is relying on the contract to demonstrate that LendingTree expressly assumed HLC's liabilities, as is required to make a claim for "assumption successor liability." (*Id.*) Accordingly, ResCap contends that third-party beneficiary issues are simply irrelevant to its claim. (*Id.* at 19–21.)

In reply, Defendants take a different tack. They first contend that the "successor liability" label in Count One is wrong: the claim is actually one for declaratory relief. (Defs.' Reply at 8.) But even if it is a successor liability claim, Defendants argue that ResCap still fails to state a claim because it did not allege (and could not allege) that LendingTree Parent acquired HLC's assets as a result of the Spin Agreement. (*Id.* at 9–10.) Defendants assert that "an assumption of liability without an accompanying transfer of assets is [not] sufficient to make a party a successor," because a transfer of assets is a prerequisite to a successor liability claim. (*Id.* at 9–11.) Because ResCap acknowledges

that HLC retained its assets after the Spin Agreement, Defendants argue, its successor liability claim fails as a matter of law.[8]  (*Id.* at 10.)

### b.    Discussion

Given the parties' arguments, the Court must first consider whether Count One asserts a claim based on successor liability.   ResCap's Complaint generally labels LendingTree Parent as HLC's "successor," (*see* Compl. ¶ 1), and its arguments to the Court characterize Count One as a "successor liability" claim.  (*See* Pl.'s Opp'n at 18–19.)  While the Court agrees that Count One does assert a claim based on successor liability, some discussion of the nuances of successor liability law is appropriate given the facts upon which ResCap's claim is based.

A corporate successor is one "that, through amalgamation, consolidation, or other assumption of interests, is vested with the rights and duties of an earlier corporation." *Successor*, Black's Law Dictionary (11th ed. 2019).  Accordingly, to even reach the arena of "successor liability," and use the related terminology of "successor" and "predecessor," some corporate change or conveyance must occur.   As the parties note, under both Minnesota or Delaware law,[9] one such change or conveyance that might create "successor

---

[8]    ResCap responded to this position at oral argument, and the parties exchanged letters with the Court after oral argument debating this proposition.  (*See* Jan 15, 2020 LendingTree Letter [Doc. No. 70] at 2; Jan. 17, 2020 ResCap Letter [Doc. No 73] at 1.)

[9]    The Court is aware that there may be a dispute as to whether Minnesota or Delaware law applies.  The Court need not resolve that dispute at this time because—as will be discussed—the necessary prerequisites for ResCap's claims (at least at the pleading stage) are the same under either Minnesota or Delaware law.  *See Leonards*, 279 F.3d at 612 (declining to decide choice-of-law issue where state's laws were the same, creating a "false conflict" on the issue); *see also Merry*, 944 F. Supp. 2d at 713 (same).

liability" is the sale of assets from one company to another. *See Ross*, 2008 WL 4899226, at *4; *Niccum v. Hydra Tool Corp.*, 438 N.W.2d 96, 98 (Minn. 1989). When that occurs, the general rule is that the purchasing company is not responsible for the selling company's debts or liabilities. *See Ross*, 2008 WL 4899226, at *4; *Niccum*, 438 N.W.2d at 98. However, both states recognize exceptions to this general rule. One such exception, relevant here, occurs when the purchaser expressly or impliedly agrees to assume such debts or liabilities. *See Ross*, 2008 WL 4899226, at *4; *Niccum*, 438 N.W.2d at 98.

Count One of ResCap's complaint does not arise out of an asset sale. Indeed, ResCap makes no allegation that LendingTree Parent purchased HLC's assets. Rather, LendingTree Parent was spun off from IAC, along with its subsidiary, LendingTree Sub. (*See* Compl., Ex. 3 (Tree.com 2008 SEC Form 10-K) at 1 ("On August 20, 2008, Tree.com (along with its subsidiary, LendingTree, LLC) was spun off from IAC into a separate publicly traded company.").) So LendingTree Parent is not a "successor," as the term is used in the context of an asset sale. *See Coffman v. Chugach Support Servs., Inc.*, 411 F.3d 1231, 1237 (11th Cir. 2005) ("Generally, one of the fundamental requirements for consideration of the imposition of successor liability is a merger or transfer of assets between the predecessor and successor companies."); *see also Hatfield v. A+ Nursetemps, Inc.*, 651 Fed. App'x 901, 907 (11th Cir. 2016) (noting that "no entity can logically be held liable as a 'successor' . . . unless it purchases or otherwise received the liable party's assets *and* one of the exclusions to the rule against successor liability applies"); *Rachford v. Air Line Pilots Ass'n*, No. C 03-3618PJH, 2006 WL 1699578, at *12–13 (N.D. Cal. June 16,

2006) ("[A] 'successor' as that word is defined in the legal context . . . 'succeeds' to the responsibilities of another.").

According to ResCap, LendingTree Parent acquired all the stock of LendingTree Sub through a spin off facilitated by the Spin Agreement. LendingTree Sub, in turn, owns all of HLC's stock. Accordingly, after the Agreement was executed, LendingTree Sub and HLC became wholly owned subsidiaries of LendingTree Parent. And while, as a practical matter, LendingTree Parent purchased HLC's assets and liabilities (it now owns HLC entirely), it did so only by virtue of its ownership of LendingTree Sub. So, as Defendants note, while "[t]he key feature of a legal successor is the transfer of ownership or other legal interests[,] [e]ven with a valid transfer of ownership, however, the corporation that acquires the assets of another corporation is generally *not* liable for the seller's liabilities." *Fed. Express Corp. v. JetEx Air Express Inc.*, No. 16-cv-1553 (CBA/RER), 2017 WL 816479, at *5 (E.D.N.Y. Jan. 26, 2017) (Reyes, Mag. J.) (citation omitted), *affirmed and adopted*, 2017 WL 780801 (E.D.N.Y. Feb. 28, 2017). As one legal commentator has explained when discussing stock acquisitions:

> Assuming all of the stock of the target [company] is acquired, the target becomes a wholly owned subsidiary of the acquiring company. This means that the acquiring company effectively acquires all of the assets and all of the liabilities of the target. These assets and liabilities, however, *are partitioned in the subsidiary*. If the [subsidiary's] liabilities ultimately exceed its assets and income-producing capacity, the subsidiary goes bankrupt and the acquisition becomes worthless. The bad news in a stock acquisition is that the investment may ultimately be worth nothing; the good news is that, absent a piercing of the subsidiary's corporate veil, the other assets of the parent are not at risk and viability of the parent is not threatened.

John H. Matheson, *Successor Liability*, 96 Minn. L. Rev. 371, 376–77 (2011) (footnotes omitted) (emphasis added). Indeed, it is a bedrock principle of corporate law that a corporate parent-subsidiary relationship, like the one between LendingTree Parent and HLC, does not *by itself* render the parent liable for the acts of its subsidiaries. *See United States v. Bestfoods*, 524 U.S. 51, 61–62 (1998) (noting the "general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation . . . is not liable for the acts of its subsidiaries" but also acknowledging there are exceptions to the rule) (citation omitted)).

The allegations set forth in Count One make clear, however, that ResCap's use of the label "successor" derives not from an asset purchase or merger, but from a theory of express assumption of liabilities. ResCap alleges that LendingTree Parent is HLC's practical "successor" because it expressly assumed HLC's liabilities by virtue of the Spin Agreement facilitating its acquisition of LendingTree Sub. (*See* Compl. ¶¶ 60–62.) In support of its allegations, ResCap notes (*see id.* ¶ 61):

(1) The 2008 Spin Agreement (Compl. Ex. 2) states that each "Spinco," which includes the LendingTree Parent as "Tree Spinco", "agrees to accept, assume and faithfully perform and discharge and fulfill all of its Corresponding Liabilities . . . ." (*See* Compl., Ex. 2 (Spin Agmt.) at 21 (§ 2.03(b)).)

(2) "Corresponding Liabilities," in turn, is defined with respect to LendingTree Parent as the "Tree Liabilities." (*Id.* at 6, 26 (§ 2.10(g)).)

(3) "[A]ny Liability of a Spun Entity, whether *arising or accruing prior to, on or after the Effective Time [of the Agreement]* and *whether the facts on which it is based occurred on, prior to or after the Effective Time* . . . shall be a Corresponding Liability of such Spun Entity's Corresponding Group" unless otherwise identified as retained by IAC. (*Id.* at 26 (§ 2.10(g)) (emphasis added).)

(4) "Corresponding Group," with respect to "the Lending and Real Estate Business" of Tree-Inc. is the "Tree Group." (*Id.* at 5.)

(5) "Tree Group," in turn, means Tree-Inc. and each other person "that is a direct or indirect Subsidiary of [Tree-Inc.] . . . ." (*Id.* at 5, 19.)

ResCap also cites to other HLC contractual agreements and LendingTree Parent financial statements (also attached to the Complaint) purportedly showing LendingTree Parent's other guarantees and acknowledgements that it had assumed HLC's liabilities. (Compl. ¶¶ 62–64.) Accordingly, as used by ResCap, the term "successor" describes LendingTree Parent's express assumption of the "Tree Liabilities" in the Spin Agreement, which included the liabilities of its subsidiaries, i.e. LendingTree Sub and HLC. And because the language assuming HLC's liabilities includes liabilities that arise or accrue "prior to, on or after" the Spin Agreement's effective date, ResCap alleges that the express assumption encompasses the HLC Judgment.[10]

Contrary to Defendants' argument, an asset purchase is simply one of the most "well-recognized" factual circumstances in which successor liability claims are raised. *See* Matheson, *supra* at 383. It is not the *only* way successor liability claims may be pursued.[11]

---

[10] Defendants' own authority acknowledges this is a means by which a company could become a "successor" to the liabilities of another. *See Fed. Express Corp.*, 2017 WL 816479, at *5 (citations omitted) (noting potential for successor liability claim where company acquires predecessor stock or liability through "explicit or implicit agreements between the former and present entities").

[11] Indeed, as one court noted, "[b]efore the theory of successor liability can apply, *a conveyance* must occur. Put differently, a sale of assets from [one] corporation to another, *or some sort of corporate reorganization* is a necessary prerequisite to successor liability." *Lincoln Nat. Life Ins. Co. v. Nicklau, Inc.*, No. 98 C 2453, 2000 WL 251708, at *2 (N.D. Ill. Feb. 24, 2000) (emphasis added).

Another avenue exists where a company acquires the stock of another corporation through a contract that expressly assumes the liabilities of the subsidiary. The case *Buck v. Endo Pharmaceuticals, Inc.* illustrates this point well. *See* No. 19-cv-837, 2019 WL 1900475 (E.D. Penn. Apr. 29, 2019). In *Buck*, the court addressed whether plaintiffs could assert a successor liability claim against the corporate parent of a medical device manufacturer premised solely on the parent-subsidiary relationship. *Id.* at *3. Noting that the two corporations were separate entities, and that one merely owned the other, the court held that a parent-subsidiary relationship, *on its own*, is not enough to establish successor liability because "the corporate form shields [the parent] from [the subsidiary's] liabilities." *Id.* at *4. However, the court also noted that "when a corporation purchases another corporation's *stock* . . . the purchasing corporation 'does not thereby assume the liabilities of the acquired corporation *unless it does so expressly*.' " *Id.* at *5 (quoting *Arch v. Am. Tobacco Co.*, 984 F. Supp. 830, 840–41 (E.D. Penn. 1997)) (emphasis added); *see also Phillips v. Cooper Labs*, 264 Cal. Rptr. 311, 318 (Cal. Ct. App. 1989) ("While under traditional rules of corporate successor liability an acquiring corporation does not assume an acquired corporation's liabilities when it purchases the acquired corporation's stock, this would not prevent the acquiring corporation from voluntarily assuming the liabilities of the acquired corporation."). The plaintiffs in *Buck* failed to allege any express assumption by the parent of the subsidiary's liabilities, and accordingly could not establish successor liability. *Buck*, 2019 WL 1900475, at *5.

Here, unlike the plaintiffs in *Buck*, ResCap does not rely on the parent-subsidiary relationship as the basis for its claim of successor liability. Rather, it alleges—by precise

citation to specific contractual language—that LendingTree Parent expressly assumed the liabilities of HLC in the Spin Agreement (even those that might arise after the Agreement's effective date) and therefore is HLC's practical successor based on a theory of express assumption of liability. (Compl. ¶¶ 60–62.) Moreover, in addition to quoting from the Spin Agreement itself, ResCap also points to corroborative evidence contained in other HLC contractual agreements and LendingTree Parent financial statements (also attached to the complaint) that purportedly show further guarantees and acknowledgements that LendingTree Parent assumed HLC's liabilities. (*Id.* ¶¶ 62–64.) Accordingly, ResCap succeeds where the plaintiffs in *Buck* failed: it has alleged that LendingTree Parent, in acquiring the stock of LendingTree Sub and HLC, expressly assumed the liabilities of those subsidiaries. Such a claim is a valid form of successor liability, even though HLC remained in existence after the Agreement was executed. *See Town of Lexington v. Pharmacia Corp.*, No. 12-cv-11645, 2015 WL 1321457, at *3 (D. Mass. Mar. 24, 2015) ("Successor liability may have no application on a theory of *de facto* merger where the predecessor entity continues to exist, but a successor *who assumes the liabilities* of its predecessor may not escape liability simply because the predecessor lives on. An express assumption of liability of the successor would be meaningless if it is unenforceable during the continued life of the predecessor entity." (emphasis added)).

The nature of ResCap's successor liability claim also resolves Defendants' arguments regarding the purported lack of any third-party beneficiary status held by ResCap under the Spin Agreement. To paraphrase one court, the nature of ResCap's "express assumption successor liability claim" means it "is not suing as a third party

beneficiary [to the Spin Agreement], but on a *variant of successor liability*, [namely], an express assumption of liability theory." *Heritage Realty*, 2007 WL 2903941, at *6 (emphasis added). Such a distinction is "well taken," because "although at first blush the distinction may seem somewhat nuanced, [ResCap] is not, in the classic sense, 'suing on the contract' as a third-party beneficiary" but rather "*relying on* the contract to demonstrate that [LendingTree Parent] expressly assumed a portion of [HLC's] liability, as required to make out a claim of express assumption successor liability." *Id.* (emphasis added). Accordingly, any failure by ResCap to allege third-party beneficiary status does not foreclose relief under Count One.

Ultimately, ResCap has clearly and plausibly alleged that LendingTree Parent expressly assumed HLC's liabilities—including the HLC Judgment—through the Spin Agreement. Taking ResCap's allegations as true, as the Court must,[12] the Court holds that ResCap's claim is legally cognizable, plausible, and therefore states a claim upon which relief can be granted. Defendants' motion to dismiss Count One for failure to state a claim is therefore denied.

### 2. Count Three – Declaratory Relief Based on Agency

Count Three of ResCap's Complaint also seeks declaratory relief against LendingTree Parent and LendingTree Sub for HLC's Judgment, on an agency theory. (Compl. ¶¶ 72–77.) Specifically, ResCap alleges that (1) Defendants were "each principals who dominated and controlled their agent, HLC"; (2) "HLC was acting within the scope

---

[12] Defendants agree the Court must, for purposes of this motion, assume LendingTree Parent assumed HLC's liabilities in the Spin Agreement. (Defs.' Reply at 11.)

of its agency when it sold defective mortgage loans to RFC"; and (3) "Defendants represented to the world that they were liable for repurchase and indemnification obligations based on contracts entered into by their agent, HLC." (*Id.* ¶ 72.) ResCap further contends that Defendants acquired HLC in order to operate its lending business through HLC, and that they controlled every aspect of HLC's business in order to exploit it for their own gain. (*Id.* ¶¶ 73–74.) Such control, ResCap alleges, is evidenced by the fact that Defendants caused HLC to operate under the brand name "LendingTree Loans," and that HLC's revenues were primarily derived from the origination and sale of loans branded as "LendingTree Loans," sourced from LendingTree consumer loan requests. (*Id.* ¶ 75.) Moreover, ResCap alleges that LendingTree Sub funded HLC's business through warehouse lines of credit at the direction of LendingTree Parent, and refused to permit HLC to retain sufficient capital or credit to hold onto loans for more than 30 days. (*Id.*) Finally, ResCap asserts that Defendants' SEC filings told "the world that HLC was their agent and was acting within the scope of its agency when it originated and sold loans to purchasers in the secondary market, such as RFC." (*Id.* ¶ 76.)

### a. Parties' Arguments

Defendants argue that Count Three fails to state a claim because (1) ResCap has failed to plausibly allege an agency relationship between HLC and Defendants; (2) due process prevents a Court from enforcing a judgment against a non-party, or even a co-obligor on a judgment, outside of the original statute of limitations applicable to the underlying claim; and (3) the applicable six-year statute of limitations bars ResCap's agency-based claim. (Defs.' Mem. at 23–26.) On the first point, Defendants argue HLC

was not their agent because ResCap has not and cannot allege that Defendants ever became a party to HLC and RFC's Client Contract, which they contend forms the basis for the HLC Judgment. (*Id.*) Accordingly, Defendants contend that ResCap has failed to plausibly allege that HLC was acting within the scope of its purported agency when it sold defective loans to RFC. (*Id.* at 23–24.) ResCap responds that its agency claims are based on Defendants' control and domination of HLC at the time it sold defective loans to RFC, not the Client Contract. (Pl.'s Opp'n at 21–22.) It also claims that it has adequately pleaded that HLC had actual authority to act on behalf of Defendants because Defendants caused HLC to source mortgage loans from LendingTree's family of websites and referral network, rely on funding from them, and sell loans to RFC on the secondary market. (*Id.* at 22–23 (citing Compl. ¶¶ 5, 23, 40, 72–75).)

With respect to due process, Defendants contend that due process principles prevent courts from enforcing judgments against a non-party unless that party is a co-obligor and the suit is filed within the applicable statute of limitations governing the claim underlying the judgment. (Defs.' Mem. at 24–25.) Because the HLC judgment was based on contractual indemnity, Defendants argue, it "sounds in breach of contract" and is therefore "governed by the [six-year] statute of limitations that would apply in a breach of contract action[.]" (*Id.* at 25.) Defendants contend that the latest possible accrual date for any contracts at issue is 2012, and because ResCap filed this suit on August 27, 2019—more than six years later—Defendants assert that Count Three is time barred. (*Id.* at 25–26 (citations omitted).) ResCap responds that as principals of HLC, Defendants are in privity with HLC and accordingly liable for, and estopped from contesting the validity of, the HLC

Judgment. (Pl.'s Opp'n at 23–24 (citations omitted).) Regarding the statute of limitations, ResCap contends its claim is timely because it is seeking to enforce a judgment, and ResCap filed its lawsuit well within the ten-year limitations period applicable to such claims. (*Id.* at 25.) In any event, ResCap notes, even under a breach of contract approach, this Court previously held that its contractual indemnification claims against HLC (and accordingly, Defendants) accrued no earlier than December of 2013, (*see id.* at 26 (citing *In re RFC & ResCap Liquidating Tr. Litig.*, 332 F. Supp. 3d 1101, 1191 (D. Minn. 2018) ("[T]he statute of limitations . . . accrued as of December 2013 . . . .")), which means that the six-year limitations period expired in December of 2019, *after* ResCap filed this case. (*Id.* at 26.)

The Court addresses these arguments in turn.

### b.    Discussion

### i.    Allegations of Agency

The Court first analyzes whether ResCap has plausibly alleged an agency relationship between Defendants and HLC. The necessary elements[13] of an agency relationship are: "(1) consent to the agency; (2) action by the agent on behalf of the

---

[13]    The parties do not assert that the Court should apply any particular body of law—whether Minnesota, Delaware, or otherwise—to ResCap's agency claims. As noted *supra*, § II.A.3, because it appears that Minnesota, Delaware, and federal common law all utilize the same general elements of an agency relationship, the Court need not and does not decide that issue now. *See Cent. States*, 835 F.2d at 1239 (declining to decide which state's law applied where they were the same); *see also Hutar* 2015 WL 4868886, at *7 (noting federal common law elements of agency relationship based on Restatement (Second) of Agency, and their general consistency with Minnesota law on agency relationships), *adopted in full*, 2015 WL 4937347; *Fisher*, 695 A.2d at 57–58 (noting the "generic" nature of a principal-agent relationship, and citing to the Restatement (Second) of Agency).

principal; and (3) exercise of control by the principal over the agent." *Doran Main, LLC v. N. Central States Regional Council of Carpenters*, No. 13-cv-3087 (MJD/FLN), 2014 WL 12600286, at *5 (D. Minn. June 11, 2014) (Noel, Mag. J.), *adopted in full*, 2014 WL 12616779 (D. Minn. Aug. 28, 2014). Agency relationships require an agreement, though not necessarily a formal contract, between the parties. *See A. Gay Jenson Farms Co. v. Cargill, Inc.*, 309 N.W.2d 285, 290 (Minn. 1981). "An agency relationship can exist between corporations, such as when one corporation makes a contract on the other's account; likewise, a subsidiary may become an agent for the corporation which controls it." *A.P.I., Inc. Asbestos Settlement Trust v. Home Ins. Co.*, 877 F. Supp. 2d 709, 722 (D. Minn. 2012) (citing Restatement (Second) of Agency § 14M cmt. A); *see also A.T. Massey Coal Co., Inc. v. Int'l Union, United Mine Workers of Am.*, 799 F.2d 142, 147 (4th Cir. 1986) (noting that "ordinary agency principles . . . control the question of whether [a subsidiary] was empowered to act as an agent authorized to bind its parent and affiliates[.]"), *cert. denied*, 481 U.S. 1033 (1987); *Publicker Indus., Inc. v. Roman Ceramics Corp.*, 603 F.2d 1065, 1070 (3d Cir. 1979) (noting principles of agency could apply to the relationship between a parent and a subsidiary); *A. Gay Jenson Farms Co.*, 309 N.W.2d at 290 (applying agency principles to parent and subsidiary for joint liability purposes).

The first element of an agency relationship—the "consent" requirement—demands that "[t]he principal . . . manifest its consent that the agent act on its behalf, and the agent [] manifest its assent to act as the principal's agent." *A.P.I., Inc. Asbestos Settlement Trust*, 877 F. Supp. 2d at 722 (citation omitted). Consent to an agency relationship need not be

45

in the form of a contract; it can be inferred from the circumstances. *See A. Gay Jenson Farms Co.*, 309 N.W.2d at 290–91 (noting that principal's direction to agent that it implement certain recommendations constituted a "manifest[ation]" of consent that third party act on its behalf). The second element, in turn, limits a principal's liability for the acts of the agent to only those acts that were "committed within the scope of the agency." *A.P.I., Inc. Asbestos Settlement Trust*, 877 F. Supp. 2d at 722 (citing *Semrad v. Edina Realty, Inc.*, 493 N.W.2d 528, 535 (Minn. 1992)). The third element, the "exercise of control" by the principal over the agent, requires only that the principal possess the "*right* of control"; it need not necessarily exercise that right to have entered into a principal-agent relationship. *Id.* (citing *Cornish v. Kreuer*, 228 N.W. 445, 446 (Minn. 1929)) (emphasis added). Of course, even when not exercised, the right of control "must be extensive; the control must not merely be over what is to be done, 'but primarily over [h]ow it is to be done.' " *Id.* (quoting *Frankle v. Twedt*, 47 N.W.2d 482, 487 (Minn. 1951)).

This structure applies in the parent-subsidiary context. *See EBG Holdings LLC v. Vredezicht's Gravenhage 109 B.V.*, No. 3184-VCP, 2008 WL 4057745, at *11 (Del. Ch. Sept. 2, 2008). To determine whether a sufficient degree of control exists, courts review, among other things, " 'the extent of overlap of officers and directors, methods of financing, the division of responsibility for day-to-day management, and the process by which each corporation obtains its business.' " *Id.* (quoting *Applies Biosys., Inc. v. Cruachem Ltd.*, 772 F. Supp. 1458, 1465–66 (D. Del. 1991) (citation omitted)). Still, a subsidiary is not an agent of its parent " '*merely* because the parent[] holds a majority of the subsidiary's shares, shares officers and directors with the subsidiary, or finances the operations of the

subsidiary.' " *Id.* (citing *Japan Petroleum Co. (Nigeria) Ltd. v. Ashland Oil, Inc.*, 456 F. Supp. 831, 841 (D. Del. 1978) (citations omitted) (emphasis added)). Rather—in the context of a motion to dismiss—the Court must consider whether ResCap has adequately alleged that there is a " 'close connection between the relationship of the corporations and the cause of action,' focusing on 'the arrangement between the parent and the subsidiary, the authority given in that arrangement, and the relevance of that arrangement to the plaintiff's claim.' " *Garza v. Citigroup Inc.*, 192 F. Supp. 3d 508, 514 (D. Del. 2016) (citation omitted), *affirmed*, 724 Fed. App'x 95 (3d Cir. 2018), *cert. denied*, 138 S. Ct. 2625 (2018).

At the pleading stage, the requisite "evidence of agency" necessary to survive a motion to dismiss is "minimal." *T-Jat Sys. 2006 Ltd. v. Expedia, Inc. (DE)*, No. 16-581-RGA-MPT, 2017 WL 896988, at *6 (D. Del. Mar. 7, 2017) (citations omitted). Given "their fact-specific nature, agency claims implicitly survive a 12(b)(6) attack for facial implausibility if they provide sufficient facts connecting the parent and subsidiary companies, and the control of the parent over the acts of the subsidiary, which results in the ultimate cause of action." *Id.* (citations omitted).

After carefully reviewing ResCap's complaint, the Court holds that ResCap has sufficiently alleged an agency relationship between Defendants and HLC that is at least strong enough to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6). Taking the allegations in the complaint as true, ResCap has alleged:

    (1)    LendingTree Parent wholly owns LendingTree Sub, which wholly owns HLC, as a result of the 2008 Spin Agreement (*see* Compl. ¶¶ 4–6, 21–22);

(2)      LendingTree Sub acquired HLC in 2004, after which it operated its lending business through HLC by originating loans and selling those loans to secondary market purchasers, including RFC (*see id.* at ¶ 22);

(3)      Over the course of RFC's and HLC's business relationship, HLC sold over 6,200 mortgage loans to RFC (*see id.* at ¶ 41);

(4)      HLC's revenues were primarily derived from the origination and sale of loans branded as "LendingTree Loans" (*see id.* at ¶ 23);

(5)      LendingTree Sub funded HLC's business and would not permit HLC to retain sufficient capital or obtain sufficient credit to hold onto loans for longer than 30 days (*see id.*);

(6)      Defendants controlled every aspect of HLC's business, exploited HLC for their own gain, and caused HLC to operate under the "LendingTree Loans" brand name, originate and sell LendingTree brand loans, and derive its revenue primarily from those loans sourced from the LendingTree network (*see id.* at ¶¶ 5, 23, 75);

(7)      Defendants declared to the world that HLC was their agent, acting within the scope of its agency when originating and selling loans to purchasers like RFC, as evidenced by 2011 and 2013 SEC filings acknowledging continued liability for HLC's indemnification, repurchase, and premium repayment obligations (*see id.* at ¶ 76);

(8)      At all relevant times, LendingTree Parent, LendingTree Sub, and HLC were managed by the same individual, Douglas Lebda, who founded the LendingTree business (*see id.* at ¶¶ 4, 15, 39);

(9)      In 2011, Defendants caused HLC to sell all of its operating assets in order to render it a shell for litigation purposes (*see id.* at ¶ 7);

(10)    ResCap (originally RFC) filed a complaint against HLC in 2013 for breach of contract and contractual indemnification in connection with the defective loans sold to RFC in the secondary market (*see id.* at ¶ 8; Compl., Ex. 9 (*Residential Funding Co., LLC v. Home Loan Ctr., Inc.*, First Am. Comp.));

(11)    Defendants caused HLC to litigate against ResCap for five-and-a-half years regarding defective loans sold by HLC to ResCap (*see* Compl. ¶¶ 9, 17, 41, 72); and

(12)    ResCap obtained a $68.5 million Judgment against HLC based on the defective loans it sold to RFC (*see id.* at 17; Compl., Ex. 10 (*ResCap Liquidating Tr. v. Home Loan Ctr., Inc.*, Judgment).

Together, these allegations (which the Court must presume to be true) plausibly allege—or, at the very least, permit the Court to reasonably and plausibly infer—an agency relationship between Defendants and HLC. The allegations show that HLC originated and sold LendingTree brand loans using LendingTree network sources and customer leads at the direction of Defendants. In doing so, Defendants necessarily consented to HLC operating on its behalf—indeed, it directed HLC to operate under the name "LendingTree Loans"—and HLC's compliance with Defendants' direction illustrates its consent. *See A.P.I. Inc. Asbestos Settlement Trust*, 877 F. Supp. 2d at 722 (citation omitted); *A. Gay Jenson Farms Co.*, 309 N.W.2d at 290. Additionally, the allegations establish that Defendants gave HLC the authority to source loans from their family of websites and phone platforms, brand their loans as LendingTree loans, and sell them to purchasers (such as RFC) in the secondary market. Accordingly, ResCap has alleged, at the very least, actual implied authority on the part of HLC to act for Defendants in selling loans, sourced from Defendants' network, to RFC. *See Schaffart v. ONEOK, Inc.*, 686 F.3d 461, 472 (8th Cir. 2012) ("Authority can be implied form the principal's words and conduct." (citation omitted)); *see also New Millennium Consulting, Inc. v. United HealthCare Servs., Inc.*, 695 F.3d 854, 857 (8th Cir. 2012) (" 'Implied authority is actual authority, circumstantially proved, and . . . includes only such powers directly connected with and essential to carrying

out the duties expressly delegated to the agent.' " (quoting *Tullis v. Federated Mut. Ins. Co.*, 570 N.W.2d 309, 313 (Minn. 1997))).

The allegations also establish the scope of HLC's authority and the significant reach of Defendants' control.  HLC was directed not only to originate and sell loans, but also on the manner and brand name under which to do so.  Put simply, ResCap has alleged that Defendants exercised such control over HLC that its commands were "not merely over what [was] to be done, 'but primarily over [h]ow it [was] to be done.' " *A.P.I. Inc. Asbestos Settlement Trust*, 877 F. Supp. 2d at 722 (quoting *Frankle*, 47 N.W.2d at 487); *see also EBG Holdings LLC*, 2008 WL 4057745, at *11 (noting that the "process by which each corporation obtains its business' is relevant to evaluating an agency relationship between parent and subsidiary); *see also Cont'l W. Ins. Co. v. Fed. Hous. Fin. Agency*, 83 F. Supp. 3d 828, 837 (S.D. Iowa 2015) (noting that "it is difficult to understand the argument that a corporation with 100% ownership of its subsidiary does not have the right to control that subsidiary").

Finally, ResCap's allegations also establish the " 'close connection between the relationship of the corporations and the cause of action' " underlying ResCap's claim for declaratory relief.  *Garza*, 192 F. Supp. 3d at 514 (citation omitted).  Specifically, ResCap has alleged that Defendants directed HLC to sell LendingTree brand loans, which it originated, to RFC in the secondary market, and that those same loans formed the basis for its 2013 lawsuit against HLC.  Moreover, ResCap contends that HLC was directed by Defendants—indeed, that Defendants and HLC were all directed by the same person, Douglas Lebda, *see EBG Holdings LLC*, 2008 WL 4057745, at *11 (considering overlap

of officers and directors and division of day-to-day management relevant to agency analysis)—to litigate ResCap's lawsuit, which ultimately led to the $68.5 million judgment against HLC for the defective loans sold to RFC at Defendants' direction. In doing so, ResCap's allegations necessarily connect " 'the arrangement between the parent and the subsidiary, the authority given in that arrangement, and the relevance of that arrangement to [ResCap's] claim.' " *Garza*, 192 F. Supp. 3d at 514 (citation omitted). That HLC relied on Defendants for funding and was not permitted to retain enough capital to hold a loan for more than 30 days only further buttresses ResCap's allegations of Defendants' control. *See EBG Holdings LLC*, 2008 WL 4057745, at *11 (noting that methods of financing are relevant to agency analysis).

### ii.     Due Process and Res Judicata

Having determined that ResCap has adequately pleaded a principal-agent relationship under Count Three, the Court now turns to Defendants' arguments regarding due process and res judicata. ResCap seeks to hold Defendants liable for the HLC Judgment—to which Defendants were not a party—without having to relitigate the merits of the claims underlying the judgment. Defendants, as noted above, argue that because they are not a party to the Judgment, it has no preclusive effect on their ability to defend themselves here.

"The preclusive effect of a federal-court judgment is determined by federal common law." *Taylor v. Sturgell*, 553 U.S. 880, 891 (2008) (citing *Semteck Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 507–508 (2001)). The effect of the judgment itself is defined by claim preclusion and issue preclusion principles, commonly known as "res judicata."

*Id.* at 892.  Under the doctrine of claim preclusion, "a final judgment forecloses 'successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit.' "  *Id.* (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748 (2001)).  In contrast, issue preclusion bars successive litigation of " 'an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context of a different claim."  *Id.* (quoting *New Hampshire*, 532 U.S. at 748–49).  The doctrines prevent relitigation by parties of matters that have been fully and fairly litigated, which in turn protects claimants from, among other things, the "expense and vexation attending multiple lawsuits[.]"  *Id.* (citations omitted) (internal quotation marks omitted).  A suit is barred by res judicata, and the relitigation of issues prevented, when five elements are satisfied:

> (1) the first suit resulted in a final judgment on the merits; (2) the first suit was based on proper jurisdiction; (3) both suits involve the same parties (or those in privity with them); (4) both suits are based upon the same claims or causes of action; and (5) the party against whom *res judicata* is asserted must have had a full and fair opportunity to litigate the matter in the proceeding that is to be given preclusive effect.

*United States v. Bala*, 948 F.3d 948, 950 (8th Cir. 2020) (quoting *Rutherford v. Kessel*, 560 F.3d 874, 877 (8th Cir. 2009)).

With respect to elements three and five, courts recognize that under due process principles, "[a] person who was not a party to a suit generally has not had a 'full and fair opportunity to litigate' the claims and issues settled in that suit."  *Taylor*, 553 U.S. at 891.  Accordingly, as the Supreme Court has noted, issue preclusion and claim preclusion are generally not applicable to nonparties to the prior case because " 'one is not bound by a

judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process.' " *Id.* at 884 (quoting *Hansberry v. Lee*, 311 U.S. 32, 40 (1940)). Indeed, applying issue and claim preclusion to nonparties "runs up against the 'deep-rooted historic tradition that everyone should have his own day in court.' " *Id.* at 892–893 (citation omitted).

Still, "the rule against nonparty preclusion is subject to exceptions." *Id.* at 893. For example, "nonparty preclusion may be justified based on a variety of pre-existing 'substantive legal relationship[s]' between the person to be bound and a party to the judgment." *Id.* at 894 (citations omitted). These "substantive legal relationships" are often referred to by courts as establishing "privity," as mentioned in element three above, between a party and a nonparty. *Id.* at 894 n.8 (citations omitted). The concept of privity expresses the idea that " 'as to certain matters and in certain circumstances persons who are not parties to an action but who are connected with it in their interests are affected by the judgment with reference to interests involved in the action, as if they were parties.' " *Rucker v. Schmidt*, 794 N.W.2d 114, 118 (Minn. 2011) (quoting *Margo-Kraft Distribs., Inc. v. Minneapolis Gas Co.*, 200 N.W.2d 45, 47 (Minn. 1972) (citations omitted) (internal quotation marks omitted)). Put another way, parties in privity are " 'so connected with the parties in estate or in blood or in law as to be identified with them in interest, and consequently to be affected with them by the litigation.' " *Id.* (quoting *Hentschel v. Smith*, 153 N.W.2d 199, 206 (Minn. 1967)). The circumstances in which privity will be found

"cannot be precisely defined" and instead require "a careful examination of the circumstances of each case." *Id.* (citation omitted).[14]

Several federal circuits, including the Eighth Circuit, have acknowledged that a principal-agent relationship may give rise to privity for the purposes of res judicata. *See Reserve Mining Co. v. E.P.A.*, 514 F.2d 492, 533–34 (8th Cir. 1975) (affirming district court conclusion that parent corporations of appellant were in privity with appellant, for res judicata purposes, where appellant was so dominated by parents that it was a mere agent or instrumentality of the parents); *see also ABS Indus., Inc. ex rel. ABS Litig. Tr. v. Fifth Third Bank*, 333 Fed. Appx. 994, 999 (6th Cir. 2009) ("[I]t is well settled that a principal-agent relationship satisfies the privity requirement of res judicata where the claims alleged are within the scope of the agency relationship."); *Lubrizol Corp. v. Exxon Corp.*, 871 F.2d 1279, 1288 (5th Cir. 1989) (noting that "principal-agent relationships may ground a claim preclusion defense, regardless [of] which party to the relationship was first sued"); *Fiumara v. Fireman's Fund Ins. Co.*, 746 F.2d 87, 92 (1st Cir. 1984) (noting that agents "clearly qualify" as persons in privity with their principals for res judicata purposes); *Spector v. El Ranco, Inc.*, 263 F.2d 143, 145 (9th Cir. 1959) (finding privity between two parties in a relationship that was analogous to an agent-principal relationship).

---

[14]    Other exceptions to the normal rule barring the use of issue or claim preclusion against nonparties include situations where the nonparty "was 'adequately represented by someone with the same interests who [w]as a party' to the suit," *see Taylor*, 553 U.S. at 894 (quoting *Richards v. Jefferson Cty.*, 517 U.S. 793, 798 (1996)), and where nonparties have assumed control over the litigation in which that judgment was rendered, *see id.* at 895 (citing *Montana v. United States*, 440 U.S. 147, 154 (1979)).

Given the Court's conclusion that ResCap has adequately alleged a principal-agent relationship between HLC and Defendants, and that its claims fall within the scope of that agency relationship, the Court holds that due process principles do not bar ResCap's suit here. Contrary to Defendants' argument, ResCap does not seek to *add* Defendants to the judgment it obtained against HLC. Rather, ResCap seeks a *separate* judgment declaring—based on, among other things, agency theory—that Defendants are liable for the HLC Judgment. Here, because ResCap has alleged a principal-agent relationship between Defendants and HLC based on Defendants' purported domination and control of HLC, and because such a relationship can create privity between Defendants and HLC, *see e.g.*, *Reserve Mining Co.*, 514 F.2d at 533–34, due process does not bar it from pursuing, at least at this stage in the litigation, "offensive" or "nonmutual" collateral estoppel against Defendants with respect to the issues litigated in the claims underlying the HLC Judgment. *See Robb v. Hungerbeeler*, 281 F. Supp. 2d 989, 995 (E.D. Mo. 2003) (noting that in an offensive or nonmutual estoppel situation, estoppel can apply "so long as the party against whom it is asserted has a full and fair opportunity to litigate the issue"); *see also Pinnacle Great Plains Operating Co., LLC v. Swenson*, No. 17-cv-120-DCN, 2017 WL 4855846, at *10 (D. Idaho Oct. 26, 2017) (concluding that principal-agent relationship creates privity, under preexisting "substantive legal relationships" exception set forth in *Taylor*, for purposes of collateral estoppel).[15]

---

[15]    Defendants rely on *Industrial Credit Co. v. Berg*, 388 F.2d 835, 841 (8th Cir. 1968) for the proposition that a court must first evaluate whether a judgment has preclusive effect before a non-party can be added to the judgment. However, that case is unavailing here. In *Berg*, the Eighth Circuit declined to find a corporate entity estopped from relitigating

ResCap has also plausibly alleged that Defendants had a full and fair opportunity to litigate the HLC judgment, even though they were not a party to the case, because of their extensive involvement in the HLC matter. ResCap specifically alleges that Defendants completely controlled HLC (*see* Compl. ¶¶ 4–5, 23), and were keenly aware of the litigation between HLC and ResCap (*see id.* ¶¶ 9 (alleging that Defendants caused HLC to litigate against ResCap while also distributing HLC's cash to Defendants), 40 (noting that HLC's counsel engagement letter was addressed to LendingTree Sub, that LendingTree Sub guaranteed payments of all of HLC's legal fees in the ResCap Litigation, and that Mr. Lebda was involved in the decision-making for HLC in the ResCap Litigation).) In light of the alleged privity between HLC and Defendants, and ResCap's plausible allegations to that effect, the Court holds that due process concerns, at this stage in the proceedings, do not bar ResCap's claim in Count Three.

### iii.     Statute of Limitations

Finally, having determined that ResCap has adequately alleged an agency relationship between HLC and Defendants, and that due process principles do not bar its claim, the Court turns to whether ResCap's claim for declaratory relief is time-barred. The parties agree that Minnesota law applies to the statute of limitations issue, but dispute which limitations period applies. ResCap contends that Count Three is a suit upon a judgment, and accordingly Minnesota's ten-year statute of limitations for the enforcement

---

the status of a contract that had been declared void in the hands of another corporate entity because the prior judgment "expressly excluded" the corporate entity against whom estoppel was sought from its reach. *Id.* at 841. Here, unlike in *Berg*, no such express exclusion language exists in the HLC Judgment.

of judgments applies.  (Pl.'s Opp'n at 25.)  Defendants assert that Count Three is a suit based on the substance underlying the HLC Judgment, namely, contractual indemnification, and accordingly Minnesota's six-year statute of limitations for breach of contract applies.  (*Compare* Pl.'s Opp'n at 25, *with* Defs.' Mem. at 24.)

Count Three is a declaratory judgment action, which has no independent statute of limitations; any limitations period applicable to Count Three is dependent upon "the substance of the right sued upon[.]"  *See Int'l Decision Sys., Inc. v. JDR Solutions, Inc.*, No. 18-cv-2951 (ECT/DTS), 2019 WL 2009249, at *2 n.3 (D. Minn. May 7, 2019) (noting that "statutes of limitation apply to a declaratory judgment action to the same extent as a nondeclaratory proceeding based on the same cause of action." (quoting *Weavewood, Inc. v. S & P Home Inv., LCC*, 821 N.W.2d 576, 579 (Minn. 2012) (citation omitted) (internal quotation marks omitted))).

Minnesota would treat the substance of ResCap's claim in Count Three as an action upon a judgment, and would therefore apply its ten-year statute of limitations.  The Minnesota Court of Appeals' decision in *Drewitz v. Motorwerks, Inc.*, 867 N.W.2d 197 (Minn. Ct. App. 2015) is instructive on this point.  In that case, the plaintiff had obtained a judgment against a corporation in 2013 for its failure to pay the plaintiff nearly $4 million in stock distributions that it should have paid between March 1999 and December 2005. *Id.* at 202–203.  In 2006 and 2007, while the litigation was pending and prior to the entry of judgment, the only remaining directors (who were also the owners) of the corporation distributed nearly all of the assets of the corporation to themselves.  *Id.* at 202.  When the plaintiff discovered those distributions, and his subsequent inability to collect his judgment

from the corporation, he amended his complaint to assert a breach of fiduciary duty claim against one of the directors and sought to recover his judgment from that director. *Id.* at 203. The district court held, however, that plaintiff's fiduciary duty claim was time-barred by Minnesota's six-year statute of limitations purportedly applicable to breach of fiduciary duty claims because he did not amend his complaint until August 2013, more than six years after the 2006 and 2007 distributions at issue. *Id.* at 203, 207.

On appeal, the Minnesota Court of Appeals reversed the district court's decision on the statute of limitations issue. *Id.* at 207–208. It noted that plaintiff's breach of fiduciary duty claim constituted "an equitable claim to collect on an *already-obtained* July 2013 judgment" against the director. *Id.* at 207. "Actions asserting equitable claims against shareholders or directors to recover judgments obtained against a corporate entity," the Court noted, "are equivalent to 'creditor's bills.'" *Id.* (citation omitted) (internal quotation marks omitted).[16] The court held, "[t]he applicable statute of limitations for such claims is *not* the six-year period found in Minn. Stat. § 541.05 . . . but rather the ten-year period for actions upon judgments under Minn. Stat. § 541.04." *Id.* at 207–208. "That is because," the court noted, "[plaintiff's] action seeks equitable enforcement of a judgment, and therefore can only be pursued once a party has already obtained a judgment that it cannot enforce at law." *Id.* at 208 (citation omitted).

---

[16]    A "creditor's bill" is "[a]n equitable suit in which a judgment creditor seeks to reach property that cannot be reached by process available to enforce a judgment." *See Creditor's Bill*, Black's Law Dictionary (11th ed. 2019).

*Drewitz* supports a similar outcome in this case. Count Three of ResCap's complaint seeks recovery against Defendants "on an *already-obtained* [2018] judgment" that it cannot collect from HLC. *Id.* at 207. The fact that Count Three is based on agency, and not breach of fiduciary duty, does not change the fact that Minnesota courts treat the substance of such a claim as one to enforce a judgment. *Id.* at 207–208. Accordingly, the most analogous Minnesota claim to Count Three is an equitable action based upon a judgment, which the Court of Appeals in *Drewitz* held was subject to Minnesota's statute of limitations for actions upon a judgment.[17] The Court therefore applies Minnesota's ten-year statute of limitations for actions seeking to enforce a judgment to Count Three.

Pursuant to Minn. Stat. § 541.04, "[n]o action shall be maintained upon a judgment or decree of a court of the United States, or of any state or territory thereof, unless begun within ten years after the entry of such judgment." *See also* Minn. Stat. § 550.01 (addressing claims seeking to enforce a judgment). ResCap obtained its judgment against HLC on June 21, 2019. (*See* Compl., Ex. 10 (*ResCap Liquidating Tr. v. Home Loan Center, Inc.*, Judgment.) It filed the present lawsuit on August 27, 2019, just over two

---

[17]    Other courts have applied "enforcement of judgment" limitations periods to analogous, though not identical, claims. *See CSX Transp., Inc. v. Tri Cty. Recycling*, No. 18-cv-12095-DJC, 2019 WL 3225754, at *4–5 (D. Mass. July 17, 2019) (applying enforcement of judgments limitations period to veil piercing claim that sought to hold defendants liable for prior judgment); *Madonna v. Francisco*, No. 13-cv-807, 2014 WL 981568, at *3–4 (E.D. Penn. Mar. 13, 2014) (applying enforcement of judgments limitations period to veil piercing and successor liability claim, and noting that veil piercing is "an equitable doctrine used to remove the protection of the corporate form"). The Court sees no reason to treat Count Three's agency theory any differently. Much like veil piercing, it is not an independent claim, but rather a theory of liability for enforcement of a judgment. *See Barabe v. Apax Partners Europe Managers, Ltd.*, 359 Fed. App'x 82, 84 (11th Cir. 2009) (noting that "agency relationship" is not an independent cause of action).

months later.  (*See* Compl.)  Accordingly, ResCap's declaratory judgment claim in Count Three is well within the ten-year period for an action upon judgments under Minn. Stat. § 541.04, and is not time-barred.[18]

In sum, Defendants' motion to dismiss Count Three for failure to state a claim is denied.

### C.    Arbitration & Stay

Having denied Defendants' motion to dismiss with respect to personal jurisdiction and the sufficiency of ResCap's pleadings, the Court turns to Defendants' final argument. Defendants argue, in the alternative, that the Court should compel the arbitration of Count One and stay the remaining claims in this lawsuit pending the outcome of the arbitration. (Defs.' Mem. at 18.)  Defendants contend that the Spin Agreement requires the parties to arbitrate any disputes.  (*Id.* at 20 (quoting Spin Agmt., § 9.03, as stating, "any . . . Dispute shall be settled by binding arbitration before the American Arbitration Association . . . in Wilmington, Delaware.").)  They argue that ResCap can only establish successor liability if it is an intended third-party beneficiary of the Spin Agreement.  Therefore, they argue, if Count One survives, ResCap must be a third-party beneficiary, bound by the Spin Agreement's arbitration provision.  (*Id.* at 21.)

---

[18]    Even assuming Minnesota's six-year statute of limitation for breach of contract applies to this case, *see* Minn. Stat. § 541.05, subd. 1(1) (2018), ResCap's complaint is still timely.  As this Court previously held, the contractual indemnification claims giving rise to ResCap's judgment against HLC accrued in December 2013.  *See In re RFC & ResCap Liquidating Tr. Litig.*, 332 F. Supp. 3d at 1191 ("[T]he statute of limitations . . . accrued as of December 2013[.]").  ResCap's complaint in this action was filed on August 27, 2019, within six years of December 2013, and accordingly is timely even under a six-year statute of limitations.  (*See* Compl. [Doc. No. 1].)

ResCap, however, contends that the Spin Agreement's arbitration clause is inapplicable by its own terms, and even if it applied, ResCap is not bound by it, as a non-signatory third party. (Pl.'s Opp'n at 26.) Additionally, it argues that even if the Court compels arbitration of Count One, it should not stay the lawsuit because a stay would be unwarranted and unfairly prejudicial to Plaintiff. (*Id.* at 33.)

### 1. Arbitration

For purposes of this motion and this issue, the Court applies Delaware law to construe the language of the Spin Agreement, as the Agreement itself provides for the application of Delaware law, (Compl., Ex. 2 (Spin Agmt. § 13.09)), and the parties have also applied Delaware law to interpret the contact. *See St. Jude Med. S.C., Inc. v. Biosense Webster, Inc.*, 818 F.3d 785, 787–88 (8th Cir. 2016) (citations omitted) (noting that under Minnesota law, a contractual choice-of-law provision will govern, absent bad faith or an intent to evade the law); *Hagstrom v. Am. Circuit Breaker Corp.*, 518 N.W.2d 46, 48 (Minn. 1994) ("Minnesota traditionally enforces parties' contractual choice of law provisions.")

Delaware follows familiar and well-settled rules of contract interpretation, "giv[ing] priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions." *Salamone v. Gorman*, 106 A.3d 354, 367–68 (Del. 2014) (citations and quotation omitted). The Court determines the intent of the parties, as reflected in the language of the contract. *Id.* (citations and quotation omitted). As to arbitration clauses in particular, when deciding whether a claim is subject to arbitration, "[f]irst, the court must determine whether

the arbitration clause is broad or narrow in scope. Second, the court must apply the relevant scope of the provision to the asserted legal claim to determine whether the claim falls within the scope of the contractual provisions that require arbitration." *NAMA Holdings, LLC v. Related World Mkt. Ctr., LLC*, 922 A.2d 417, 430 (Del. Ch. 2007).

The arbitration clause here is narrow, in that it limits arbitration to disputes between the parties to the Spin Agreement. (Compl., Ex. 2 (Spin Agmt. § 9.03).) The arbitration clause provides, in relevant part, "If the Dispute has not been resolved by the dispute resolution process described in Section 9.02, the Dispute Parties agree that any such Dispute shall be settled by binding arbitration before the American Arbitration Association ("AAA") in Willington, Delaware[.]" (*Id.*) The "Dispute Parties" include the "Claimant Party" (i.e., "Any Party" who commences the dispute resolution process) and the "Responding Party" (i.e., "the receiving Party or Parties"). (*Id.* § 9.02.) The definition of "Parties," with a capital "P," is set forth in the preamble to the Spin Agreement. (*Id.* § 1.01 (Definition of "Parties").) The preamble states that the Spin Agreement "is entered into by and among" IAC and the "Spincos," who are, collectively, the "Parties." (*Id.* (Preamble ("Separation & Distribution Agmt.").) The Spin Agreement defines a "Dispute" in the context of "Dispute Resolution; Mediation," stating,

> Any Party . . . may commence the dispute resolution process . . . by giving the other Party or Parties with whom there is such a controversy, claim or dispute written notice . . . of any controversy, claim or dispute of whatever nature arising out of or relating to this Agreement or the breach, termination, enforceability or validity therefore (a "Dispute") which has not been resolved in the normal course of business.

(*Id.* § 9.02.)

The Court finds that ResCap does not fall within the narrow scope of the Spin Agreement's arbitration clause for three reasons. First, it is not a "Party" to the Spin Agreement. That term is limited to IAC and the "Spincos" (HSN, Inc., Interval Leisure Group, Inc., Ticketmaster, and Tree.com, Inc.) (*Id.* § 1.01 & Preamble.) The dispute resolution section of the Spin Agreement defines "Dispute Parties" as the "Claimant Party" and the "Responding Parties," both of which must be a "Party," with a capital "P," as opposed to a general "party." (*Id.* § 9.02(a).) Second, Count One of the Complaint is not a "Dispute," as defined by the Spin Agreement. The Spin Agreement contemplates that a "Dispute" is a "controversy, claim or dispute" arising out of, or related to, the Spin Agreement between "[a]ny Party" and "the other Party or Parties with whom there is such a controversy, claim or dispute." (*Id.*) Again, Plaintiff is not a "Party" to the Spin Agreement, therefore, Count One is not a "Dispute" under § 9.02 that is subject to the arbitration clause in § 9.03. Third, because Plaintiff is not a "Party" to a "Dispute" under the Spin Agreement, the dispute resolution provisions of § 9.02—"[a]ny Party . . . may commence the dispute resolution process . . . by giving the other Party or Parties . . . written notice"—are inapplicable. (*Id.*) *See Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 355 (5th Cir. 2003) (finding that arbitration agreement did not bind the Government to arbitrate, as it did not sign the agreement, nor was it defined as a party in the agreement).

Furthermore, as a non-signatory to the Spin Agreement, ResCap did not agree to be bound by its terms. *Id.*; *see also Nitro Distrib., Inc. v. Alticor, Inc.*, 453 F.3d 995, 999 (8th Cir. 2006) ("Because the plaintiffs never indicated a willingness to arbitrate with Amway, the estoppel cases cited by Amway are inapposite and insufficient justification for binding

the plaintiffs to an agreement they never signed.); *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995) ("Arbitration is contractual by nature—a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.") (internal quotation omitted). Granted, under some circumstances, nonsignatories may be bound to arbitration agreements based on the following theories: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; or (5) estoppel. *Thomson-CSF, S.A.*, 64 F.3d at 776. Defendants argue that Plaintiff, as a third-party beneficiary to the contract, "is bound by the [Spin Agreement's] benefits and burdens alike," and therefore must be estopped from avoiding arbitration.[19] (Defs.' Mem. at 3–4, 19–20.)

The Court has already addressed Defendants' third-party beneficiary argument in its discussion of Defendants' motion to dismiss Count One. (*See supra* § II.C.1.) As noted, Plaintiff need not be an intended third-party beneficiary in order to establish an express assumption of liabilities. (*See id.*) While Defendants now argue, in the arbitration context, that Plaintiff is estopped from avoiding arbitration, in their Rule 12(b)(6) argument, Defendants argued to the contrary, and correctly observed that the Spin Agreement

---

[19]     Yet in their argument that Count One fails under Rule 12(b)(6), *see supra* § II.C.1, Defendants assert that ResCap is *not* a third-party beneficiary. (Defs.' Mem. at 15–16 (stating, "Here, ResCap is not a party to the 2008 Spin Agreement and makes no allegations that, if true, would make it plausible that ResCap is an intended third-party beneficiary of that agreement. Nothing in the Complaint or the 2008 Spin Agreement suggests that ResCap (or its predecessor, RFC) was in any way involved or considered in negotiating or drafting the 2008 Spin Agreement, or that the parties to that agreement intended for it to benefit ResCap or RFC, much less that benefiting ResCap or RFC was a 'material aspect' of the parties' decision to enter into the 2008 Spin Agreement.").)

"specifically disclaims creating any third-party beneficiaries." (Defs.' Mem. at 18 (quoting Compl., Ex. 2 (Spin Agmt.) § 13.07)) ("[T]here are no third party beneficiaries of this Agreement or any Ancillary Agreement[.]")

In general, for estoppel to bind a nonsignatory to an arbitration agreement, the nonsignatory must receive a direct benefit from the agreement. *See Nitro Distrib.*, 453 F.3d at 998 (rejecting estoppel theory applied to non-signatory plaintiffs to compel arbitration, as they did not directly benefit from the contract, even if they might have received some indirect benefit); *Source One Enters., L.L.C. v. CDC Acquisition Corp.*, No. 02-cv-4925 (PAM/RLE), 2004 WL 1453529, at *6 (D. Minn. June 24, 2004), *superseded by statute on other grounds*, Minn. Stat. § 302A.661) ("Examining the language of the Agreement, the Court concludes that it expresses no intent to benefit Source One."); *Thomson-CSF, S.A.*, 64 F.3d at 778–79 (finding that an indirect benefit "is not the sort of benefit which this Court envisioned as the basis for estopping a nonsignatory from avoiding arbitration.")  Examples of direct benefits include contractual rights, *Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 (2d Cir. 1999), and monetary benefits, such as significantly lower insurance rates.  *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 418 (4th Cir. 2000).  "Indirect benefits" do not derive directly from the contractual agreement.  *Thomson-CSF, S.A.*, 64 F.3d at 779 (finding nonsignatory received no benefit from the contract—a contract that had the practical effect of eliminating a competitor.)

Here, no language in the Spin Agreement evinces an intent to directly benefit ResCap.  To the contrary, the Spin Agreement rejects the notion of any third-party

beneficiaries, as noted.  (Compl., Ex. 2 (Spin Agmt.) § 13.07)) ("[T]here are no third party beneficiaries of this Agreement or any Ancillary Agreement[.]")  ResCap received no such direct benefit by virtue of the Spin Agreement.  Nor has ResCap knowingly accepted a direct benefit or exploited the terms of the Spin Agreement, *Thomson-CSF, S.A.*, 64 F.3d at 777–78, and any indirect benefit here is insufficient to support estoppel.  *See id.* at 779.  Furthermore, the authority on which Defendants rely is distinguishable and does not mandate arbitration.[20]

Alternatively, some courts have recognized a duty to arbitrate between a signatory and nonsignatory based on the close relationship between the two entities, as well as the relationship of the alleged wrongs to the nonsignatory's obligations and duties in the contract, and because the claims are intertwined with the underlying contract obligations.  *Id.* (collecting cases).  Not only is such a theory of estoppel factually inapplicable here,

---

[20]    In *Invista S.A.R.L. v. Rhodia, S.A.*, 625 F.3d 75, 85 (3d Cir. 2010), the court did not reach the issue of estoppel in finding that the defendant had no enforceable right of arbitration.  *Capital Group Cos., Inc. v. Armour* , No. Civ. A. 422-N, 2004 WL 2521295, at *7 (Del. Ch. Nov. 3, 2004), involved a non-signatory who received a direct benefit during the life of the contract, in the form of a beneficial stock interest. Here, however, there is no direct benefit.  In *ELA Med., Inc. v. Arrhythmia Mgmt. Assocs., Inc.*, No. 06-cv-3580 (JNE/SRN), 2007 WL 892517, at *6, (D. Minn. Mar. 21, 2007), this Court enforced a forum selection clause against a non-signatory where the non-signatory defendant-employer and signatory defendant-employee "shared[d] a common interest," and the agreement was closely related to the contractual dispute.  Here, nothing suggests that ResCap shares a common interest with any signatory to the Spin Agreement.  Finally, the court in *Town of Smyrna v. Kent Levy Court*, No. Civ. A. 244-K, 2004 WL 2671745, at *4 n.15 (Del.  Ch. Nov. 9, 2004), relied on cases which found that arbitration may only be compelled where the non-signatory receives a "direct benefit" from the agreement containing the arbitration provision.  (citing *Int'l Paper Co.*, 206 F.3d at 418; *Am. Bureau of Shipping*, 170 F.3d at 353).  Again, here, Plaintiff received no direct benefit under the Spin Agreement.

as the Second Circuit recognized in *Thomson-CSF, S.A.*, cases in which estoppel has been applied under this theory typically involve the estoppel of a *signatory* from avoiding arbitration with a nonsignatory. 64 F.3d at 779. The opposite is true here.

None of the other circumstances to bind a nonsignatory to the arbitration agreement appear to be present here.[21] Rather, as ResCap notes, the "Parties" to the Spin Agreement "bargained for the arbitration clause to apply to disputes under the agreement, and not its effect in a subsequent successor liability action." (Pl.'s Opp'n at 30.) The arbitration clause of the Spin Agreement is inapplicable to Plaintiff, which never signed the Agreement, and never bargained for arbitration.[22] For all of the foregoing reasons, the Court denies Defendants' alternative request to arbitrate Plaintiff's claim in Count One of the Complaint.

---

[21] There is no separate contractual relationship between Plaintiff and a Party to the Spin Agreement such that incorporation by reference applies, *see Thomson-CSF, S.*A., 64 F.3d at 777, Plaintiff has not subsequently engaged in conduct showing that it assumed the obligation to arbitrate, *see id.*, there is no agency relationship between Plaintiff and a Party to the Spin Agreement, *see id.; see also Nitro Distrib.*, 453 F.3d at 999, and the facts do not support a veil piercing or alter ego theory to bind Plaintiff to the arbitration clause. *See Thomson-CSF, S.A.*, 64 F.3d at 777–78.

[22] Plaintiff notes that in the analogous context of contractual choice-of-law provisions, such provisions do not bind those who are not parties to the contract. (Pl.'s Opp'n at 29–30 (citing *Source One Enters.*, 2004 WL 1453529, at *5 n.4).) Rather, the parties to a contract bargain for choice of law to apply to the interpretation of the contract, not for its effect in successor liability actions. (*Id.* (citing *Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 466 (3d Cir. 2006); *Travis v. Harris Corp.*, 545 F.2d 443, 446 (7th Cir. 1977); *Lopez v. Delta Int'l Mach. Corp.*, No. Civ. 15-0193 (JB/GBW), 2017 WL 3142028, at *37 n.39 (D.N.M. July 24, 2017)).)

### 2.    Stay

Defendants also request that if the Court compels arbitration, it should stay the entire action pending arbitration. (Defs.' Mem. at 21.)  Because the Court finds that arbitration is inapplicable here, this request is denied as moot.[23]

## III.    ORDER

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion to Dismiss for Lack of Jurisdiction, Failure to State a Claim, or in the Alternative, to Compel Arbitration [Doc. No. 29] is **DENIED**.

Dated: March 20, 2020                       s/Susan Richard Nelson
                                            SUSAN RICHARD NELSON
                                            United States District Judge

---

[23]    Even if arbitration were appropriate as to Count One, which it is not, the Court would decline to stay the entire action.  It is true, as Defendants note, that courts have the discretionary authority to stay an entire action even when only a subset of the claims are subject to arbitration.  *AgGrow Oils, L.L.C. v. Nat'l Union Fire Ins. Co.*, 242 F.3d 777, 782 (8th Cir. 2001).  However, "issues such as . . . the prejudice that may result from delays must be weighed in determining whether to grant a discretionary stay." *Id.* at 782–83.  A stay here would materially prejudice Plaintiff.  For nearly six years, ResCap has litigated its claims against HLC at significant cost, and has obtained a Judgment for the Trust. Staying the instant lawsuit would only compound the delay of a resolution.